FEB 17 2026 AM 8:40
FILED - USDC - FLMD - ORL

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

## ORLANDO DIVISION

MARVELLE J. "JAY" BALLENTINE,

*Plaintiff,*

    v.

META PLATFORMS, INC.;

ACCENTURE LLP;

TASKUS, INC.; and

GENPACT USA, INC.

*Defendants.*

Case No. _____

## COMPLAINT FOR DAMAGES AND DECLARATORY AND

## INJUNCTIVE RELIEF

## DEMAND FOR JURY TRIAL

## I. PRELIMINARY STATEMENT

1.    This case challenges the abuse of Meta's Child Sexual Exploitation enforcement policy to permanently exclude business owners from digital commerce under designations for which no violations have ever been identified.

2.      Plaintiff Marvelle J. "Jay" Ballentine is a small-business owner who operated a mobile RV repair service from Clermont, Florida. He sourced 100% of his customers through Facebook Groups, Messenger, and Ads. He invested approximately $20,000 in specialized equipment, training, and Meta advertising. Plaintiff maintained his professional network and continuing education access through the NRVTA Alumni Facebook Group, the sole such resource in his trade.

3.      On July 4, 2022, Meta Platforms, Inc. permanently severed Plaintiff's right to make and enforce contracts under its Child Sexual Exploitation enforcement policy. Meta did not identify any content that violated the policy. It has never identified any such content.

4.      Before the disablement became permanent, Plaintiff submitted his United States passport for identity verification. The passport displayed the image of a Black man. A human reviewer employed by a Vendor Defendant conducted the final review with access to Plaintiff's profile photograph and government-issued identification. The disablement was affirmed within hours.

5.      Meta made 105.9 million CSE enforcement actions in 2022. Meta made "over" 26 million reports to the National Center for Missing and Exploited Children that same year. The difference, nearly 80 million CSE enforcement actions, was not reported to NCMEC under 18 U.S.C. § 2258A. Either Meta identified apparent violations and did not report them, or Meta applied its most severe enforcement category where no apparent violations existed.

6.    The enforcement surge peaked at 30.1 million actions in Q3 2022. By early 2025, it had collapsed 85%. In 2022 alone, Meta reversed 8,100 CSE enforcement decisions on Facebook through its appeals process. During the same enforcement period, Meta restored accounts of white users flagged under the same CSE policy family, including at least one user with a confirmed CSE violation and one whose account was reinstated after counsel submitted a formal legal demand. Plaintiff, who had no confirmed violation, was permanently excluded.

7.    The Vendor Defendants, Accenture LLP, Genpact USA, Inc., and TaskUs, Inc., operated Meta's content-moderation enforcement pipeline under contract, staffing human reviewers for final enforcement determinations across policy categories including CSE. Accenture alone earned approximately $500 million annually from the arrangement. Accenture has documented that its own automated systems produce, in its words, "different degrees of wrongness for different people" and over-enforce against historically marginalized users.

8.    More than three and a half years have passed. No law enforcement agency, local, state, or federal, has contacted Plaintiff. No CyberTipline report has been confirmed. No content has been identified. No standard has been cited. No factual basis has been provided. Plaintiff's business is gone. The $20,000 investment has yielded no return. His access to continuing professional education has been severed.

9.    In September 2025, Plaintiff filed a civil rights action in the Northern District of California, where Meta maintains its principal place of business. Over five months and sixty-two docket entries, the following occurred: Plaintiff filed five motions. All five were denied. The Initial Case Management Conference was vacated and never reset. No Rule 26(f) conference took place. Discovery never opened. And even a simple request for Judicial Notice was ignored.

10.    The hearing on Defendants' motions to dismiss was reset three times: from January 30 to February 13, from February 13 to February 20, and from February 20 to March 27, 2026. No party filed a motion requesting any of these changes. Between January 7 and January 8, 2026, defense counsel communicated with the courtroom deputy regarding hearing logistics outside noticed motion practice.

11.    During this period, Accenture filed two successive motions to dismiss. The first, filed October 16, 2025, asserted "a legitimate community standards violation by Ballentine." The second, filed October 31, 2025, revised this to "a legitimate violation of another community standard unrelated to CSE." Neither filing identified any content, any standard, or any factual basis. As of voluntary dismissal, neither assertion had been clarified or withdrawn.

12.    The CSE designation carries consequences that Defendants understood: when attorneys hear those three letters, they refuse representation. Plaintiff's commercial property has been withheld and his participation in digital

4

commerce permanently foreclosed. It is against this backdrop that Plaintiff

proceeds, pro se. Plaintiff, a Florida RV technician, has come back home seeking

relief.

## II. JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331

(federal question) and 28 U.S.C. § 1343(a)(3)—(4) (civil rights). Plaintiff's federal

claims arise under 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3).

14.    This Court has supplemental jurisdiction over Plaintiff's state-law

claims under 28 U.S.C. § 1367(a) because they arise from the same case or

controversy as the federal claims.

15.    This Court has jurisdiction to grant declaratory relief under 28

U.S.C. §§ 2201—2202.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because

a substantial part of the events giving rise to the claims occurred in this District.

Plaintiff resided in Florida at all relevant times, accessed Defendants' platforms

and services from Florida, and suffered the injuries alleged herein in Florida.

## III. STANDING

17.    Plaintiff suffered concrete injuries including loss of an operating

business, destruction of business property and data, loss of professional

reputation, and severe emotional distress.

18.    These injuries are fairly traceable to Defendants' conduct as alleged

herein.

5

19.    The Court can redress Plaintiff's injuries through damages, declaratory relief, and injunctive relief.

## IV. PARTIES

### A.    Plaintiff

20.    Plaintiff Marvelle J. "Jay" Ballentine is a Black individual who operated a mobile RV repair business in Florida.

21.    Plaintiff brings this action in his individual capacity. He does not seek to represent, certify, or recover for any class under Rule 23(b)(1), (b)(2), or (b)(3). The structural remedies requested are tailored to redress Plaintiff's own injuries and operate, if at all, incidentally with respect to nonparties.

### B.    Defendants

22.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, California 94025.

23.    Defendant Accenture LLP is a limited liability partnership organized under the laws of Illinois with its principal place of business in Illinois.

24.    Defendant TaskUs, Inc. is a Delaware corporation with its principal place of business in Texas.

25.    Defendant Genpact USA, Inc. is a Bermuda corporation with its principal place of business in New York.

### C.    Defined Terms

26.    Accenture LLP, TaskUs, Inc., and Genpact USA, Inc. are referred to collectively as the "Vendor Defendants."

27.    Meta Platforms, Inc. and the Vendor Defendants are referred to collectively as "Defendants."

### D.    Personal Jurisdiction over Vendor Defendants

28.    Each Vendor Defendant is subject to personal jurisdiction in this District. Plaintiff is a Florida domiciliary who accessed Defendants' platforms from Florida and suffered the injuries alleged herein in Florida. In the alternative, for federal claims, personal jurisdiction lies under Fed. R. Civ. P. 4(k)(2).

### E.    Joinder

29.    Joinder is proper under Fed. R. Civ. P. 20(a)(2) because claims against Meta and the Vendor Defendants arise out of the same transaction or series of transactions (the design and execution of Meta's CSE enforcement workflow) and share common questions of law and fact.

## V. FACTS

### A.    Parties and Foundation

30.    Plaintiff Marvelle J. "Jay" Ballentine is a Black business owner who domiciled in Florida and operated his mobile RV repair business in Florida and surrounding states at all times relevant to this action.

31.    Plaintiff created his Facebook account in late 2004 or early 2005 on "TheFacebook.com."

32.    Defendant Meta Platforms, Inc. operates Facebook and Instagram, serving over 3 billion users globally and generating $116.6 billion in revenue in 2022, with 97.5% derived from advertising.

33.     Public reporting indicates Facebook entered into a business arrangement with Accenture around 2012. A 2021 New York Times examination estimated the value of Facebook's contracts with Accenture for platform policy enforcement services at least $500 million per year.

34.     Accenture operates platform policy enforcement services for Meta through facilities in Austin, Texas; Dublin, Ireland; Manila, Philippines; and other locations, employing approximately 5,800 reviewers dedicated exclusively to Meta's platforms, including work performed from Meta's Fremont (Alameda County) campus through at least January 2023.

35.     Accenture reviewers performed final-review and disposal of cases based on Meta's guidelines. Meta retained override authority.

**B.     CSE Pipeline—Scale & Reporting Discretion**

36.     In 2022, Meta actioned approximately 105.9 million items under its "Child Sexual Exploitation" (CSE) enforcement category across Facebook and Instagram. Of these, 92.2 million occurred on Facebook, and 13.7 million on Instagram, an objectively higher risk platform.

37.     That same year, Meta submitted approximately 26 million CyberTipline reports to the National Center for Missing and Exploited Children (NCMEC) pursuant to 18 U.S.C. § 2258A. No alternative reporting mechanism exists under federal law.

38.     The difference between the 105.9 million CSE-labeled enforcement actions and the approximately 26 million NCMEC reports reflects nearly 80

million CSE-labeled actions that were not referred to NCMEC. Section 2258A leaves "apparent violation" determinations to the provider's discretion.

39.    Meta's public disclosure states: "Electronic Service Providers (ESPs) are legally obligated to report apparent violations of laws related to child sexual abuse material (CSAM) they become aware of to NCMEC's CyberTipline."

40.    Meta's CSE enforcement policy states it removes content that "sexually exploits children." Meta states it "report[s] apparent child exploitation to the National Center for Missing and Exploited Children (NCMEC)."

41.    Section 2258A requires reporting "as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances from which there is an apparent violation" of child exploitation laws. Meta retained discretion over which CSE-labeled enforcement actions resulted in permanent account terminations, which were referred to law enforcement, and which were restored. These decisions occurred after the user's identity, including race, was visible to Meta and its enforcement partners.

For the approximately 80 million CSE enforcement actions Meta did not report to NCMEC in 2022:

(a)    Meta identified apparent violations of child exploitation laws in these actions *but did not report them* to NCMEC; or

(b)    Meta applied its CSE enforcement category to these actions despite identifying no apparent violations of child exploitation laws.

42.     Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

### C.     Enforcement Mechanics

43.     Meta and the Vendor Defendants operated a joint platform policy enforcement pipeline in which Meta established policy enforcement guidelines while the Vendor Defendants staffed human reviewers for final policy enforcement decisions. Within this pipeline, the Vendor Defendant conducting final review executed the routing determination at the final step described in ¶47 that decided whether a case proceeded into the CyberTipline reporting workflow under 18 U.S.C. § 2258A, or into an alternate workflow. Meta retained override authority.

44.     Accenture billed Meta approximately $50 per hour for each human reviewer while paying them approximately $18 per hour. TaskUs disclosed in SEC filings that Meta comprised 22% of its fiscal year 2024 revenue. Genpact operated approximately 1,600 reviewers in Hyderabad dedicated to Facebook content review by 2019.

45.     Vendor Defendant personnel performing final-review enforcement had access to account-level identifiers, including profile photos, names, and in some cases government-issued ID images, sufficient to reveal a user's race. The CSE designation was affirmed by a vendor reviewer who, during the identity

verification process, had full visibility of Plaintiff's Black face through his profile photo and government-issued ID.

46. Following affirmation of the CSE designation, the reviewing Vendor Defendant executed the operational decision that determined whether Plaintiff's case would:

(a) enter the NCMEC reporting workflow triggering mandatory law enforcement notification under 18 U.S.C. § 2258A; or

(b) bypass law enforcement entirely through an alternative workflow. This routing decision placed the reviewing Vendor Defendant at the chokepoint between platform enforcement and criminal investigation.

47. *Alternative identification under Rule 8(d)*. The identity of the specific Vendor Defendant who conducted Plaintiff's July 4–5, 2022 final review is within Defendants' exclusive possession; accordingly, Plaintiff pleads in the alternative that Accenture LLP, TaskUs, Inc., or Genpact USA, Inc. performed the review that affirmed the CSE invocation, with precise identification to be confirmed from review-session telemetry, queue-assignment records, and tool-access logs.

**D. Bias Knowledge**

48. In 2018, Accenture publicly framed algorithmic "fairness" as measuring outcomes "for different people" and acknowledged that automated models can be "wrong" more often for some groups. Its Responsible AI leadership stated there is "no such thing as a perfect algorithm" and warned that

models exhibit different error rates "for different people, based on characteristics that should not influence outcomes."

49.    In 2019—2020, Meta commissioned and received a Civil Rights Audit that documented "false positive" removals affecting African American users and warned that algorithmic moderation could exacerbate racial inequities. The auditors also noted Meta did not maintain robust protected-class measurement for enforcement, limiting diagnosis of disparate impact.

50.    Between 2019 and 2021, Meta conducted 'Project WoW,' surveying 10,000 users and determining that its algorithms were better at detecting hate speech against white people but worse at detecting hate speech against people of color. When Meta researchers proposed corrections to this documented racial bias, Meta Vice President of Global Public Policy Joel Kaplan blocked deployment of the remediation in 2021.

51.    In February 2021, Meta prepared an internal report titled "Industry Update on Racial Justice and Black Users." *That report documented a 2.7 percent decline in Black monthly users of Facebook in a single month,* to approximately 17.3 million adults. Meta has not published year-over-year retention data, enforcement breakdowns, or reinstatement rates disaggregated by race.

52.    Meta's Transparency Center discloses restoration statistics, demonstrating institutional policy enforcement discretion.

**E.    Plaintiff's Sequence**

53.    Plaintiff, a survivor of childhood sexual abuse with no prior blue-collar experience, enrolled in the National RV Training Academy specifically because NRVTA certification provided contractual rights to continuing education through the NRVTA Alumni Facebook Group, the sole professional development network providing continuing education and field support essential for competent RV repair services.

54.    Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's marketing and networking capabilities.

55.    At the time of his account termination, Plaintiff sourced 100% of all his clients and leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000. Plaintiff agreed to engage in future customer service contracts with foreknowledge that he would have to rely on continuing education benefits conferred to him by the NRVTA.

56.    In June 2022, Plaintiff began marketing his RV repair business on Facebook and paid to access tools and services delivered through his Facebook for Business account. Meta billed his credit card in accordance with his 'Facebook for Business' account activity between June 27, 2022 to June 30, 2022.

57.    On July 4, 2022, Meta baselessly invoked its CSE policy against Plaintiff and requested identity verification as a precondition to final human review. Plaintiff submitted his U.S. passport, which displayed the image of a Black man.

58.    The Vendor Defendant reviewer conducting Plaintiff's review had Plaintiff's government-issued identification and profile photograph visible during review and was authorized to validate or invalidate Meta's invocation of its Child Sexual Exploitation (CSE) policy.

59.    Within hours of receiving Plaintiff's identification, Meta ratified the permanent termination and routed the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children.

60.    The July 4, 2022 termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, advertising campaign data, and access to the NRVTA alumni group for continuing education. Plaintiff registered for a new Facebook account in April 2023 in order to access continuing education through the NRVTA Alumni Facebook Group. Meta promptly terminated the new account before Plaintiff could publish any content.

**F.    Motive, Contract, and Property Deprivation**

61.    Meta's enforcement systems generated documented false positives across all policy categories. The Civil Rights Audit confirmed these false positives disproportionately affected Black users. On information and belief, each false

positive on a business account created potential liability for wrongful

termination, contract interference, and discrimination claims.

62.    On June 9, 2022, Plaintiff received his first email from 'Meta for

Business,' the rebranded successor to Facebook for Business, marking his first

commercial interaction with Meta since 2017 when he operated under terms

requiring court jurisdiction. This renewed engagement subjected Plaintiff to

Meta's Commercial Terms containing a 30-day arbitration opt-out clause.

63.    On June 16, 2022, Meta restricted Plaintiff's dormant Meta for

Business account, which contained no content, no advertisements, and no

transactions, citing 'violations of our Advertising Policies or Community

Guidelines.' Meta sent Plaintiff a message indicating the restriction could be

lifted if Plaintiff complied with 'increased security requirements for Business

Accounts' within five hours. Plaintiff was required to supply and validate his

phone number as a precondition for compliance with said increased security

requirements. Plaintiff complied.

64.    The contractual relationship between Plaintiff and Meta (Facebook

for Business) was consummated between June 27–30, 2022 when Meta billed

Plaintiff's credit card for services delivered. Meta terminated his Facebook and

Facebook for Business account on July 4, 2022 before Plaintiff could exercise his

contractual right to opt-out of arbitration.

65.    **ALTERNATIVE PLEADING:** Either (a) Meta contends Plaintiff

accepted Commercial Terms, but then rendered the 30-day opt-out right

meaningless by terminating his account before Plaintiff could exercise his opt-out rights; OR (b) Meta contends no Commercial Terms acceptance occurred by July 4, meaning no advertising arbitration governed the termination.

66.    Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's marketing and networking capabilities. At the time of termination, Plaintiff sourced 100% of all his client contacts and leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000.

67.    Plaintiff held multiple property interests through Meta's platforms: business communications documenting $3,000 in pending transactions; customer relationships generating 100% of business leads; administrative credentials controlling these assets; advertising campaign data; and access to the NRVTA Alumni Group providing continuing education and field support essential to competent business operations. These interests satisfied all property criteria: precise definition, exclusive control, legitimate exclusivity.

68.    The termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, and severed access to the NRVTA Alumni Group, the sole source of continuing education and technical consultation enabling Plaintiff to safely perform repairs.

69.    Meta terminated these property rights July 4, 2022. The termination destroyed stored value. The termination severed commercial relationships. The termination eliminated business operations. The termination foreclosed on Plaintiff's ability to derive the contractual benefits as conferred to him by the NRVTA.

70.    Meta's deployment of the CSE designation foreclosed review, as its strikes policy allows account disablement after one occurrence for CSE violations. Yet Meta, through its partner Accenture, reversed 8,100 CSE enforcement actions in 2022, including 4,000 during Q3 when Plaintiff's property and contract interests were severed, the most reversals in its documented history. Despite this demonstrated discretion, more than three years have elapsed without Meta returning Plaintiff's business data or restoring his right to make and modify contracts.

### G. Comparators

**Table 1: Comparator Matrix**

| Name | Race | Type | Violation | Reinstated |
|---|---|---|---|---|
| **Marvelle J. Ballentine** | **Black** | *RV Technician* | **NON-EXISTENT** | **No** |
| **Steven Ertelt** | White | Organization/ Business Page | **CSE flag** (medical C-section video) | **Yes** |
| COMP-1 | White | *Individual* | **Confirmed CSE** | Yes |
| Abby Covington | White | Individual (Adoption Page) | Human Exploitation | Yes |
| @slut.social | White | Content Creator | Sexual Content/Adult Nudity/Solicitation | Yes |
| Betty Tompkins | White | Artist (Commercial) | Nudity/Sexual Content (artistic) | Yes |

71.    From 2020 to 2025, each entity identified in the matrix was enforced within Meta's sexual-content and Child Sexual Exploitation enforcement family. Each matter proceeded through Meta's enforcement apparatus, including vendor-staffed review queues, to human review, including final decisions. Individual accounts displayed race through profile photographs or identity materials. Organizational accounts were white-led entities as reflected in public reporting.

72.    In early 2025, Plaintiff discovered that Steven Ertelt's account was flagged under the CSE policy for a medical C-section video. Meta restored Steven Ertelt's account, after receiving a reinstatement demand from his counsel. On

April 22, 2025, Plaintiff submitted a formal reinstatement demand to Meta in which Meta constructively denied.

73.    COMP-1's case reveals the discretionary nature of Meta's CSE enforcement apparatus. On or around September 3, 2024, Plaintiff discovered a post published to the X Platform (formerly known as Twitter) which showed that on October 17, 2020, COMP-1 posted content that Meta subsequently confirmed constituted a CSE violation.

74.    COMP-1 received a temporary suspension and was reinstated after Meta's CSE confirmation. Meta's own review stated: "We confirmed that it does not follow our Community Standards on child sexual exploitation." Yet Meta imposed only a temporary suspension on COMP-1's account. COMP-1's restoration after Meta-confirmed CSE policy violation demonstrates discretion over sanctions and restoration.

75.    Meta restored contractual status for the white comparators despite the cited violations. Plaintiff remains permanently excluded from the platform and its commercial infrastructure. Plaintiff's contractual relationship with Meta has not been restored. Plaintiff's access to the contractual rights conferred to him by NRVTA remains severed. Plaintiff's property remains withheld.

## H.    §1983 State-Action / Governmental Nexus

76.    Electronic communication service providers must report apparent child exploitation violations to the National Center for Missing and Exploited Children upon obtaining actual knowledge. 18 U.S.C. § 2258A. Meta operates as

such a provider. NCMEC operates under congressional charter, 42 U.S.C. § 5773, and serves as the exclusive clearinghouse for these reports.

77.    Section 2258A(g)(3) expressly authorizes NCMEC to forward reports to state and local law enforcement. All fifty states operate Internet Crimes Against Children task forces that receive and investigate these reports. Florida's ICAC Task Force operates in Plaintiff's home jurisdiction and depends on platform reports for case origination.

78.    In 2022, Meta made 105.9 million CSE enforcement actions across its platforms. Meta reported approximately 26 million items to NCMEC that same year. The difference reflects nearly 80 million CSE-labeled actions that Meta did not report to law enforcement.

79.    Meta exercised pure discretion over which CSE-labeled enforcement actions to report to NCMEC, which to withhold from law enforcement, and which resulted in permanent account terminations. These decisions occurred after users' identities, including race, were visible to Meta and its enforcement partners.

80.    Meta's reporting decision determines who faces criminal prosecution. State ICAC units investigate what Meta reports. They cannot investigate what Meta withholds. Report to NCMEC means state investigation follows. No report means no investigation occurs.

81.    Section 2258A(h) mandates one-year evidence preservation after a report. This preservation serves state prosecutions. State investigators access

this evidence through NCMEC. Meta controls what evidence is preserved and what is destroyed.

82.    The nearly 80 million unreported CSE flags were not transmitted to state investigators. The 26 million reported flags were transmitted to state investigators. Defendants made these determinations within Meta's enforcement framework, with a Vendor Defendant executing the routing described in ¶47 and Meta retaining override authority.

83.    State law enforcement restructured investigations around platform reports. They depend on CyberTipline submissions. Meta's reporting decisions determine which cases enter state criminal systems. Meta performs prosecutorial triage.

84.    Within Meta's enforcement framework, a Vendor Defendant executed the routing decision that determined which CSE-labeled cases entered the NCMEC reporting workflow and which bypassed law enforcement entirely. This routing function, described in ¶47, placed a Vendor Defendant at the chokepoint between platform enforcement and state investigation.

85.    A Vendor Defendant's routing decision determined which users would face state investigation. Cases routed to the NCMEC workflow triggered state law enforcement review. Cases routed to the alternative workflow did not. Meta retained override authority, but a Vendor Defendant's routing was the operational gateway between platform enforcement and state action.

86.    Either a Vendor Defendant routed Plaintiff's case to the NCMEC workflow and Meta submitted a CyberTipline report, or a Vendor Defendant routed the case through the alternative workflow and no report was submitted. If a Vendor Defendant routed to the NCMEC workflow and Meta submitted a report, NCMEC disseminated it to Florida law enforcement under § 2258A(g)(3), triggering state investigative processes and making Defendants and state agencies joint actors.

87.    Either Defendants reported Plaintiff to NCMEC and triggered state investigation, making them joint actors with state agencies, or they invoked federal criminal authority without reporting any crime, making the CSE designation pretextual. More than three years have passed since July 4, 2022 without law enforcement contact, demonstrating no report was filed.

88.    First, the deprivation resulted from state-created authority. The statutory scheme under § 2258A makes Meta's reporting decisions determinative of criminal investigations. State agencies depend on Meta's reports. The statutory framework created the deprivation.

89.    Second, Defendants acted as state actors by screening cases for prosecution. State agencies delegated this screening authority through systematic reliance on NCMEC routing. A Vendor Defendant's routing decision and Meta's reporting determination jointly select which cases enter the prosecutorial pipeline. This is active participation in law enforcement, not mere regulatory compliance.

90.    Within this framework, Defendants exercise three powers: determining apparent criminal violations (through a Vendor Defendant's routing and Meta's reporting decisions), controlling evidence through mandatory preservation, and initiating state criminal process.

91.    Defendants' CSE decisions directly control state criminal justice. A Vendor Defendant's routing decision and Meta's reporting determination trigger investigations, preserve evidence under § 2258A(h), and determine who faces prosecution. Defendants exercise prosecutorial screening power that exceeds platform policy enforcement. The state delegated these powers through the statutory framework and systematic reliance on Defendants' determinations.

92.    Defendants terminated Plaintiff's account July 4, 2022, invoking its CSE policy after his government ID was viewed, displaying the face of a Black man. A Vendor Defendant's reviewer affirmed the baseless CSE invocation after viewing Plaintiff's identification, while during the same period, Defendants restored white users flagged under the CSE policy but maintained Plaintiff's permanent exclusion.

## I.    Scienter and Agreement

93.    In 2018, Accenture publicly acknowledged that automated models produce "different degrees of wrongness for different people." Accenture's Responsible AI leadership stated there is "no such thing as a perfect algorithm" and warned that models exhibit different error rates "for different people, based on characteristics that should not influence outcomes."

94.    Between 2019 and 2020, Meta commissioned and received a Civil Rights Audit that documented "false positive" removals disproportionately affecting African American users. The audit warned that algorithmic moderation could exacerbate racial inequities. The Civil Rights Audit further noted that Meta did not maintain robust protected-class measurement for enforcement actions, limiting the company's ability to diagnose disparate impact across racial groups.

95.    Meta's Transparency Center states the company does not offer appeals for violations with "extreme safety concerns, such as child exploitation imagery." Meta's strikes policy provides that accounts "may be disabled after one occurrence" for severe violations including child sexual exploitation.

96.    In 2022, Meta actioned approximately 105.9 million items under its Child Sexual Exploitation enforcement category across Facebook and Instagram.

97.    Upon actioning these 105.9 million items, Meta obtained actual knowledge of each flagged item and faced a decision whether to report it to the National Center for Missing and Exploited Children under 18 U.S.C. § 2258A. Meta chose not to report Plaintiff to the National Center for Missing and Exploited Children.

98.    Meta reported approximately 26 million items to NCMEC in 2022, and did not report approximately 80 million items that had been actioned under the CSE enforcement category.

99.    Meta reversed 993,400 CSE enforcement actions on Facebook in 2022. Of these reversals, 985,300 occurred without user initiated reviews and

8,100 occurred following final human review through the Defendants' joint policy enforcement framework.

100.   Meta reported approximately 25% of its CSE enforcement actions to NCMEC in 2022. On January 31, 2024, Meta CEO Mark Zuckerberg testified before Congress that Meta reports "all apparent" CSE content to NCMEC. This representation was reiterated in Meta's April 19, 2024 submission to the Senate Judiciary Committee.

101.   Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

102.   Since 2012, Meta and Accenture have maintained a business arrangement. Public reporting valued this relationship at approximately $500 million for Accenture's performance and delivery of platform policy enforcement services in 2021.

103.   Public reporting characterized Accenture as Facebook's single biggest partner in platform enforcement. The Meta-Accenture relationship constitutes a strategic partnership involving joint development of solutions, shared business development opportunities, and multi-year collaborative planning that "redefined the traditional boundaries of an outsourcing relationship."

104.   TaskUs, Inc. has provided content-moderation and trust-and-safety services to Meta since at least 2019. The International Association of

Outsourcing Professionals recognized the Meta-TaskUs partnership for operational integration in 2022.

105.   TaskUs disclosed in its SEC filings that its largest client comprised 22% of fiscal year 2024 revenue. That client was Meta Platforms, Inc. TaskUs reported approximately $995 million in total revenue for fiscal year 2024.

106.   Genpact has provided content-moderation and trust-and-safety services to Meta during the period relevant to this action. By 2019, Genpact operated a team of approximately 1,600 reviewers in Hyderabad performing Facebook content review.

107.   Genpact's Hyderabad team reviewed content in English, Indian languages, Arabic, and other regional dialects.

108.   Meta conducts weekly calls, regular site visits, and monthly and quarterly business reviews led from California with its moderation vendors regarding enforcement operations. These reviews included Meta personnel based in California. Meta issued standard operating procedures, quality assurance protocols, and policy updates to each Vendor Defendant from California.

109.   Facebook employees directly trained Accenture reviewer teams at facilities in Manila, Philippines and Warsaw, Poland, providing instruction on Meta's policies and review procedures. Accenture dedicated approximately 5,800 reviewers exclusively to Meta's platform review queues during the relevant period.

110.    TaskUs operated moderation teams in the Philippines and in the United States, including Texas, that staffed Meta enforcement queues during the relevant period. TaskUs reviewers received Meta-provided standard operating procedures, policy updates, and training materials for CSE-labeled enforcement matters.

111.    Genpact operated moderation teams in Hyderabad, India that staffed Meta enforcement queues during the relevant period. Genpact reviewers received Meta-provided standard operating procedures, policy updates, and training materials for CSE-labeled enforcement matters.

112.    Accenture reviewers used Meta-provided account-review tools when conducting enforcement reviews within Meta's enforcement framework. Meta retained authority over Accenture's policy enforcement determinations while Accenture exercised operational discretion in conducting final human review of platform policy violations and edge cases.

113.    TaskUs reviewers used Meta-provided reviewer interfaces when performing review of CSE-labeled matters. Meta retained authority over TaskUs policy enforcement determinations while TaskUs exercised operational discretion in conducting final human review.

114.    Genpact reviewers used Meta-provided reviewer interfaces when performing review of CSE-labeled matters. Meta retained authority over Genpact policy enforcement determinations while Genpact exercised operational discretion in conducting final human review.

115.   Meta's enforcement systems include fields sufficient to identify whether a review was performed by vendor personnel and, if so, by which vendor.

116.   Accenture's platform policy enforcement positions require reviewers to exercise 'strong critical thinking and decision-making skills' in investigating, resolving, and relaying complex enforcement issues while applying client guidelines. Accenture reviewers conducting final review could view users' government-issued identification displaying racial characteristics when making client guided enforcement decisions.

117.   Vendor Defendant reviewers reviewing enforcement decisions had immediate access to users' profile photographs displaying racial characteristics before any identity verification request was initiated. When Meta requested government identification from users requesting review of CSE determinations, Vendor Defendant reviewers conducting final review could see the face photograph on the submitted identification document.

118.   In July 2022, when a CSE enforcement case was opened in the reviewer interface used by TaskUs, the affected user's profile photograph was displayed by default. When Meta requested government identification, the submitted image was visible to the TaskUs reviewer.

119.   In July 2022, when a CSE enforcement case was opened in the reviewer interface used by Genpact, the affected user's profile photograph was

displayed by default. When Meta requested government identification, the submitted image was visible to the Genpact reviewer.

120.   Final review outcomes by Accenture personnel influenced whether a CSE-labeled matter was routed to the CyberTipline Reporting Workflow or to a Non-Report Workflow, consistent with Meta SOPs and subject to Meta override.

121.   In July 2022, final review outcomes by TaskUs personnel influenced whether a CSE-labeled matter was routed to the CyberTipline Reporting Workflow or to a Non-Report Workflow, consistent with Meta SOPs and subject to Meta override.

122.   In July 2022, final review outcomes by Genpact personnel influenced whether a CSE-labeled matter was routed to the CyberTipline Reporting Workflow or to a Non-Report Workflow, consistent with Meta SOPs and subject to Meta override.

123.   Accenture LLP, TaskUs, Inc., and Genpact maintain—or can obtain from Meta Platforms, Inc.—review-session telemetry, tool-access logs, and queue-assignment records sufficient to determine whether any vendor reviewer accessed Plaintiff's account materials on July 4–5, 2022.

124.   Review-session telemetry, tool-access logs, and queue assignment records for July 2022 were subject to routine rotation or overwrite unless preserved by litigation hold.

125.   Meta, Accenture, TaskUs, and Genpact maintained and executed a common enforcement workflow in which vendor reviewers affirmed CSE-labeled

outcomes and influenced routing after identity-revealing imagery was visible. Each vendor processed appeals, affirmed outcomes, and applied Meta's standard operating procedures as delivered from California.

126.   On July 4, 2022, the following sequence occurred: First, Plaintiff's profile photograph displaying his Black face was visible to the enforcement system. Second, Meta requested government-issued identification. Third, Plaintiff submitted his U.S. passport containing his photograph. Fourth, a Vendor Defendant reviewer viewed Plaintiff's Black face as his passport was visible on screen, and affirmed the baseless invocation of Meta's Child Sexual Exploitation policy. Meta ratified the outcome.

### J.    Post-Filing Conduct and Off-Docket Events (Oct. 31,   2025– Feb. 10, 2026)

127.   On October 31, 2025, the parties participated in a court-ordered preservation conference. During that conference, Plaintiff requested that Defendants confirm whether litigation holds had been keyed to Plaintiff's provided account identifier. Defendants did not confirm that litigation holds were keyed to Plaintiff's provided account identifier.

128.   During the October 31, 2025 preservation conference, Plaintiff proposed two existence-only paths to confirm whether a NCMEC CyberTipline report existed for Plaintiff's July 4, 2022 enforcement matter: (a) a yes/no custodian declaration from Meta, or (b) a limited third-party confirmation from

NCMEC stating only the existence and date of any report. Defendants declined both options.

129.  Prior to the October 31, 2025 preservation conference, Plaintiff, proceeding pro se against Kirkland & Ellis LLP and Orrick, Herrington & Sutcliffe LLP, requested sequential defendant-specific sessions. Defendants declined, requiring Plaintiff to conduct the conference jointly against both defense teams.

130.  On October 16, 2025, Accenture LLP, through counsel, filed a motion to dismiss in this action stating: "An alternative explanation for Accenture's recommendation—a legitimate community standards violation by Ballentine—is consistent with the facts alleged in the complaint." The filing did not identify any specific content, any specific community standard, or any factual basis for the assertion.

131.  On October 31, 2025, Accenture LLP, through counsel, filed a second motion to dismiss revising the language to: "a legitimate violation of another community standard unrelated to CSE." The filing did not identify any specific community standard that Plaintiff allegedly violated, any specific content that Plaintiff allegedly posted, or any factual basis for the revised statement.

132.  On January 7—8, 2026, *counsel for Accenture communicated directly with the courtroom deputy concerning hearing logistics outside any noticed motion practice.*

133.   On February 9, 2026, Plaintiff filed a related civil action in the Middle District of Florida, captioned Ballentine v. Accenture LLP, et al., Case No. 6:26-cv-00286-AGM-DCI.

134.   On February 10, 2026, after Plaintiff filed the Florida action, counsel for Accenture directed Plaintiff to include a named individual defendant from that action on ongoing case communications and added that individual to email chains after Plaintiff removed him, further impairing Plaintiff's ability to obtain representation and to prosecute his claims without direct contact with a named defendant.

135.   As of the date of this filing, no federal, state, or local law enforcement agency has contacted Plaintiff regarding the July 4, 2022 enforcement matter. Defendants have not confirmed the existence or nonexistence of a NCMEC CyberTipline report for the enforcement matter. Defendants continue to withhold Plaintiff's account-resident business data.

**K.    Accenture's Public Docket Publications and Plaintiff's CSA-Survivor Status**

136.   Plaintiff is a survivor of childhood sexual abuse. Plaintiff disclosed this fact during litigation in the Northern District of California. Accenture had actual knowledge of Plaintiff's CSA-survivor status before the filings described in this subsection.

137.   On October 16, 2025, Accenture, through litigation counsel, filed a motion to dismiss on the public docket of the Northern District of California

asserting: "An alternative explanation for Accenture's recommendation—a legitimate community standards violation by Ballentine—is consistent with the facts alleged in the complaint." The filing identified no content, no community standard, and no factual basis. It repeatedly placed Plaintiff's name in proximity to "Child Sexual Exploitation" and "CSE" terminology.

138.   On October 28, 2025, Accenture's counsel acknowledged in writing that Accenture's argument "expressly accepts as true" the complaint's assertion that there was no CSE violation and stated the forthcoming filing would "include language reinforcing this point."

139.   On October 31, 2025, Accenture filed a second motion to dismiss revising the language to "a legitimate violation of another community standard unrelated to CSE." The second filing again identified no content, no community standard, and no factual basis. Neither assertion has been clarified, substantiated, or withdrawn.

140.   The assertion that Plaintiff committed a "legitimate community standards violation" was not necessary to any Rule 12(b)(6) defense Accenture raised. Accenture's motions raised failure to state a claim, preemption, and immunity. None required asserting that Plaintiff actually committed a violation. The assertions and CSE-adjacent pairings were not pertinent to any issue before the court.

141.   Accenture published both assertions on a public federal docket accessible to any member of the public, including prospective counsel,

prospective clients, and members of Plaintiff's professional and personal community in Florida where he resides.

## COUNT I

### VIOLATION OF 42 U.S.C. § 1981: Interference with Right to Make, Enforce, and Modify Advertising Contracts
### *(Against Meta Platforms, Inc.)*

142.    Plaintiff incorporates by reference Facts Sections A through G, I, and J.

143.    Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981.

144.    Meta Platforms, Inc. formed and enforced contracts with Plaintiff, including a longstanding account governed by Meta's terms and commercial service agreements which were consummated when Meta charged for, and delivered Meta for Business services between June 27 and June 30, 2022. These contracts provided Plaintiff access to paid advertising services and related business tools.

145.    On July 4, 2022, Meta sent Plaintiff a notice that it was severing Plaintiff's access to his Meta for Business and Facebook account via an entirely baseless invocation of its Child Sexual Exploitation (CSE) policy.

146.    Plaintiff immediately requested a review.

147.    Meta conditioned processing of the review on submission of government issued identification.

148.    Before any identity verification step, Meta reviewers had Plaintiff's profile photograph visible in the account interface. At the decision point during the review, Meta's human reviewers had both the profile photograph and the submitted identification visible on screen.

149.    Within hours of Plaintiff's identification submission, Meta upheld the permanent disablement and terminated Plaintiff's advertiser access and business tools.

150.    During the same enforcement window, similarly situated white users flagged under the same policy, including Steven Ertelt and the comparator account identified as COMP-1 in Section G, were restored while Plaintiff remained permanently disabled. Meta acted because of Plaintiff's race.

151.    Meta's termination and refusal to restore concerned the making and enforcing of Plaintiff's advertising contracts with Meta, including formation, performance, modification, termination, enforcement, and the enjoyment of benefits and privileges. The disablement cut off his ability to purchase and run ads and foreclosed his contractual right to modify the agreement by exercising the 30 day arbitration opt out afforded in Meta's Commercial Terms, because Meta terminated within the 30 day arbitration opt out period.

152.    But for Meta's race-based decision to uphold the permanent termination during review after viewing Plaintiff's identification, Plaintiff would have continued to modify and enjoy the benefits and privileges of his advertising

contract with Meta. Meta has not restored his access despite Plaintiff's April 22, 2025 reinstatement demand.

153.   The foregoing conduct constitutes race-based interference with Plaintiff's right to make, enforce, and modify contracts in violation of 42 U.S.C. § 1981.

**COUNT II**

**VIOLATION OF 42 U.S.C. § 1981: Interference with Right to Make and Enforce Third-Party Contracts**
*(Against Meta Platforms, Inc., Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.)*

154.   Plaintiff incorporates by reference Facts Sections A through G, I, and J.

155.   Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981, which right is protected against racially motivated third-party interference.

156.   Before the disablement, Plaintiff sourced 100 percent of his clients and leads from Meta's platforms, had completed more than $2,000 in customer transactions through Facebook sourced leads, and had pending service appointments valued at approximately $3,000.

157.   Plaintiff held a contract with the National RV Training Academy that conferred continuing education and field support benefits through the NRVTA Alumni Facebook Group, which Plaintiff relied upon to competently perform RV repair services.

158.   Meta delivered Plaintiff notice of its CSE invocation upon Plaintiff's account and required government identification as precondition to final human review. Meta received Plaintiff's identification, and within hours ratified the invocation and severed Plaintiff's access to customer communications, his Facebook sourced sales pipeline, and the NRVTA Alumni Group.

159.   Vendor Defendant personnel conducted the final human review of Plaintiff's case within Meta's enforcement framework and affirmed the CSE invocation. Meta ratified the final outcome. Vendor Defendant reviewers had Plaintiff's profile photograph visible before enforcement and had his government identification visible at the decision point during the final review, and exercised discretion to affirm the CSE invocation in the absence of any specific grounds.

160.   During the same period, similarly situated white users identified in the Facts were restored while Plaintiff's ability to make and modify contracts remained severed. Defendants acted because of Plaintiff's race.

161.   Defendants' sequence of actions created substantial race-based impediments to Plaintiff's ability to form, perform, and enforce contracts with existing and prospective customers by blocking him from responding to leads, confirming appointments, performing scheduled work, invoicing, collecting payment, and maintaining client relationships.

162.   Defendants' actions also prevented Plaintiff from accessing the NRVTA Alumni Group and receiving the continuing education benefits for which he had contracted.

163.   But for Meta's race-based disablement and refusal to restore, and but for a Vendor Defendant's final review affirmation at the decision point, Plaintiff would have continued to make new customer contracts, to perform and enforce existing agreements including the pending $3,000 in appointments, and to access his NRVTA contractual benefits.

164.   Defendants' continued withholding of account access and business communications has further prevented Plaintiff from enforcing existing agreements and securing performance or payment from customers with whom he had been communicating at the time of disablement.

165.   The foregoing conduct constitutes third party interference with Plaintiff's right to make and enforce contracts in violation of 42 U.S.C. § 1981.

## COUNT III

### VIOLATION OF 42 U.S.C. § 1982: Interference with Right to Hold and Convey Personal Property
*(Against Meta Platforms, Inc., Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.)*

166.   Plaintiff incorporates by reference Facts Sections A through K.

167.   Plaintiff is Black and asserts under 42 U.S.C. § 1982 the same right as white citizens to hold and convey personal property, which right is protected against racially motivated third-party interference.

168.   Meta Platforms, Inc. permanently disabled Plaintiff's account on July 4, 2022 and has refused restoration, thereby blocking Plaintiff's possession, access, and use of account-resident business property, including customer

communications, pending appointments, saved campaigns and creative libraries, and administrative credentials controlling these assets, and cutting off Plaintiff's ability to access and use the records, materials, and communications housed in the NRVTA Alumni Group to which he had a right.

169.   Vendor Defendants staffed final human review within Meta's enforcement pipeline. On July 4, 2022, a Vendor Defendant reviewer conducted the initial profile review and final human review of Plaintiff's case, then affirmed the CSE invocation within Meta's framework.

170.   Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; following Plaintiff's account disablement, a similarly situated white Meta for Business account flagged under the same CSE policy—Steven Ertelt—was restored to full platform access and control of account-resident business property, while Plaintiff remained permanently excluded. Meta acted because of Plaintiff's race.

171.   Vendor Defendant's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the CSE invocation within Meta's enforcement framework without any identifying grounds because of Plaintiff's race.

172.   But for Meta's race-based disablement and refusal to restore, Plaintiff would have continued to hold, use, and convey his business property on Meta's platforms.

173.   But for Vendor Defendant's race-aware final-review affirmation on July 4, 2022, Meta would not have permanently deprived Plaintiff of his business property.

174.   The disablement and non-restoration deprived Plaintiff of possession and control of his business records, customer lists and receivables, administrative credentials; eliminated access to customer communications and pending appointments valued at $3,000; severed access to the records, materials, and communications housed in the NRVTA Alumni Group; and destroyed goodwill and revenue streams derived from Facebook-sourced customer relationships.

175.   The post-filing conduct described in Section J, including refusal to allow existence-only confirmation regarding CyberTipline reporting, refusal to confirm preservation keyed to Plaintiff's identifier, and continued withholding of account-resident business data, furthered the ongoing withholding of Plaintiff's account-resident business property and data.

176.   The foregoing conduct constitutes interference with Plaintiff's right to hold and convey property in violation of 42 U.S.C. § 1982.

## **COUNT IV**

### **VIOLATION OF 42 U.S.C. § 1983: Deprivation of Constitutional Rights Under Color of State Law**
*(Against Meta Platforms, Inc., Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.)*

177.   Plaintiff incorporates by reference Facts Sections A through K.

178.   Plaintiff is Black and brings this claim under 42 U.S.C. § 1983 for deprivation of rights secured by the Fourteenth Amendment, including Equal Protection, and, in the alternative, Procedural Due Process. Plaintiff alleges Meta and Vendor Defendant acted under color of law as set forth below.

179.   On July 4, 2022, Defendants permanently disabled Plaintiff's account invoking Meta's CSE policy without identifying any specific grounds and have refused reinstatement, including after Plaintiff's April 22, 2025 reinstatement demand. Meta's CSE lane offers no opportunity for account restoration; nonetheless, Defendants routed Plaintiff's case for internal final human review within the joint enforcement framework.

180.   In connection with the challenged enforcement, Meta and Vendor Defendants exercised discretionary authority inside a child-exploitation reporting and preservation pipeline that includes triage, classification, evidence preservation, and routing decisions whether to file and transmit CyberTipline reports and user data to NCMEC and law enforcement. Vendor Defendant's routing decision determined which cases entered the NCMEC reporting workflow and Meta's reporting decision determined whether CyberTipline reports were filed. Plaintiff alleges, in the alternative, that Defendants' enforcement is fairly attributable to the state because: (a) Vendor Defendants routed Plaintiff's case to the NCMEC workflow, and Defendants jointly participated in the resulting preservation and triage functions whether or not a CyberTipline report was ultimately transmitted; if the evidence shows a report

was transmitted, Meta filed or caused it to be filed, and if none was transmitted, the state-attribution arises under subparts (b)—(c); or (b) Defendants acted pursuant to a statutory reporting and preservation regime that compelled and significantly encouraged the challenged conduct; or (c) Defendants' CSE enforcement and the routing function at the chokepoint described in ¶47 are pervasively entwined with law-enforcement-facing functions such that the state is responsible for the decision.

181.   Defendants control the gateway between platform enforcement and state criminal process under 18 U.S.C. § 2258A by determining whether an enforcement matter is routed into the CyberTipline reporting workflow or into a non-report path, with Meta retaining override authority.

182.   After suit commenced, when presented with an existence-only path to confirm whether Plaintiff's July 4, 2022 enforcement matter entered the CyberTipline workflow (a yes/no custodian declaration, or a limited third-party confirmation stating only existence and date), Defendants declined both options and did not confirm that litigation holds were keyed to Plaintiff's provided account identifier.

183.   The refusal to allow existence-only confirmation while controlling whether a matter is reported or not, together with control over preservation of associated enforcement and identity-verification records, reflects Defendants' continued participation at the § 2258A chokepoint and supports the inference of

joint action with state actors who rely on CyberTipline reports to initiate investigations.

184. Through the foregoing, Defendants acted under color of law and jointly participated in the deprivation of Plaintiff's rights secured by the Constitution and laws of the United States.

185. Meta's decisionmakers and a Vendor Defendant's reviewer had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and contractual status while Plaintiff remained permanently excluded. Defendants acted because of Plaintiff's race.

186. With respect to procedural due process (if reached), Plaintiff identifies protected interests in access to and use of account-resident business data, customer communications, pending appointments, receipts, audience and advertising assets, and associated contractual relationships. Defendants provided no timely or meaningful notice of specific grounds and no neutral pre- or post-deprivation opportunity to be heard before permanently impairing those interests.

187. But for Defendants' race-based exercise of discretionary authority within the reporting and preservation pipeline, including Vendor Defendant's routing decision and Meta's reporting decision, and their disablement and refusal-to-restore decisions, Plaintiff would not have been deprived of equal

protection, and, in the alternative, would not have been deprived of the identified property and contract interests without due process of law.

188.   Plaintiff suffered loss of contract and property interests, economic injury from the elimination of business access and use, and reputational harm associated with the CSE designation.

189.   The foregoing conduct by Meta Platforms, Inc. and Vendor Defendants, acting under color of state law, constitutes deprivation of Plaintiff's rights in violation of 42 U.S.C. § 1983.

## COUNT V
### VIOLATION OF 42 U.S.C. § 1985(3): Conspiracy to Deprive Plaintiff of Civil Rights
*(Against Meta Platforms, Inc., Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.)*

190.   Plaintiff incorporates by reference Facts Sections A through K.

191.   Plaintiff is Black and asserts a claim under 42 U.S.C. § 1985(3) for a private conspiracy undertaken with class-based, invidiously discriminatory animus to deprive him of equal protection and equal privileges, including the rights secured by 42 U.S.C. §§ 1981 and 1982.

192.   Meta Platforms, Inc. agreed and acted to permanently exclude Plaintiff from its platforms and business tools: on July 4, 2022 Meta imposed a permanent severance after invoking its Child Sexual Exploitation policy without identifying any specific grounds; Meta thereafter refused reinstatement, including after Plaintiff's April 22, 2025 reinstatement demand. These acts

furthered the agreement's objective by preventing Plaintiff from making and enforcing contracts and from holding and using his account-resident business property.

193.   Vendor Defendants joined and acted in furtherance of the agreement by staffing final human review within Meta's enforcement pipeline. On July 4, 2022, Meta routed Plaintiff's case to a Vendor Defendant for final human review. The review was conducted in adherence to Meta's policy enforcement guidelines. The Vendor Defendant reviewer affirmed the CSE invocation which resulted in a permanent severance within Meta's policy enforcement framework.

194.   Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and control over account-resident business property while Plaintiff remained permanently excluded. Meta acted with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

195.   Vendor Defendant's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the CSE invocation within Meta's enforcement framework with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

196.  But for Meta's agreement and acts in furtherance, including the permanent disablement and refusal to restore, Plaintiff would not have been deprived of equal protection and of the rights secured by §§ 1981 and 1982.

197.  But for Vendor Defendant's agreement and discrete act in furtherance—its race-aware initial, and final-review affirmation of the baseless CSE invocation on July 4, 2022—Meta would not have permanently deprived Plaintiff of his contractual and property rights.

198.  Plaintiff is Black. Defendants agreed and acted in concert to deprive Plaintiff of equal rights to make and enforce contracts and to recover and use his account-resident business property and data, and to continue the effects of the July 4, 2022 enforcement by sustaining his exclusion and withholding record clarity concerning the enforcement and any associated reporting.

199.  In furtherance of the agreement, Defendants undertook the following overt acts: (i) on October 31, 2025, declined to confirm litigation holds keyed to Plaintiff's provided identifier; (ii) on October 31, 2025, declined both a Meta custodian declaration and an existence-only third-party confirmation concerning whether a NCMEC CyberTipline report existed for the July 4, 2022 enforcement and, if so, its date; (iii) insisted that the preservation conference proceed jointly rather than in sequential, defendant-specific sessions; (iv) in public filings, asserted that an unspecified "legitimate" community-standards violation by Plaintiff explained the enforcement and later revised that assertion to reference another unspecified standard, without identifying any content or

standard in either filing; and (v) on January 7—8, 2026, communicated directly with the courtroom deputy concerning hearing logistics outside any noticed motion practice.

200.  On February 10, 2026, after Plaintiff filed a related civil action in Florida, Accenture's counsel directed Plaintiff to include a named individual defendant from that action on ongoing case communications and added that individual to email chains after Plaintiff removed him, further impairing Plaintiff's ability to obtain representation and to prosecute his claims without direct contact with a named defendant.

201.  The overt acts identified in the preceding paragraphs occurred after the vendor reviewer's final-review step at which Plaintiff's identity was visible, and after Defendants restored white users flagged under the same enforcement family during the same general period, and were taken to maintain Plaintiff's permanent exclusion and the withholding of his account-resident business property and data.

202.  As a direct and proximate result of the conspiracy and overt acts, Plaintiff suffered deprivation of equal rights to make and enforce contracts, continued loss of access to his account-resident property and business data, loss of business opportunities, and reputational harm impeding his ability to retain counsel.

203.  Plaintiff suffered loss of contract and property interests, eliminated access to customer communications and pending appointments, severed access

to the NRVTA Alumni Group essential to his business operations, and destroyed goodwill and revenue streams derived from Facebook-sourced customer relationships.

204.  The foregoing conduct constitutes a conspiracy to violate civil rights under 42 U.S.C. § 1985(3).

### FLORIDA STATE CLAIMS (Damages Only)
### COUNT VI
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS (Florida Common Law)
*(Against Meta Platforms, Inc., Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.)*

205.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

206.  Plaintiff operated a mobile RV repair business in Florida and maintained existing and prospective business relationships with customers and prospective customers formed and maintained through Defendants' platforms, including ongoing customer communications and scheduled service appointments maintained through Facebook-based communications.

207.  At the time of the July 4, 2022 enforcement event, Plaintiff sourced 100% of his clients and leads from RV-related Facebook Groups and Facebook advertising, had completed over $2,000 in customer transactions through Facebook-sourced leads, and had pending service requests valued at approximately $3,000.

208.  Defendants knew of Plaintiff's existing and prospective business relationships because Plaintiff used Defendants' platforms to advertise, communicate with customers, manage business communications, and operate and maintain his customer-facing sales pipeline through Meta's services. Meta billed Plaintiff's credit card for advertising services between June 27 and June 30, 2022.

209.  On or about July 4, 2022, Meta invoked a Child Sexual Exploitation ("CSE") enforcement designation against Plaintiff without identifying any violative content, required Plaintiff to submit government-issued identification as a precondition to final human review, and permanently disabled Plaintiff's Facebook account and associated business and advertising access. A reviewer employed by one of the Vendor Defendants conducted the final human review within Meta's enforcement framework with Plaintiff's profile photograph and government-issued identification visible and affirmed the CSE designation. Meta ratified the permanent disablement and routed the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children.

210.  The permanent disablement and resulting loss of platform access intentionally and directly interfered with Plaintiff's existing and prospective business relationships by severing Plaintiff's access to customer communications, pending appointments, and customer contact information necessary to maintain, complete, and continue those relationships.

211.   Defendants were not parties to Plaintiff's customer relationships and had no legal justification or privilege to disrupt those relationships through a baseless CSE designation and identity-visible final-review process that resulted in permanent disablement and loss of customer communications. Plaintiff alleges that the interference was intentional and unjustified, and was carried out through improper means, including misuse of the CSE enforcement designation without identified violative content and the permanent disablement decision made and affirmed after Plaintiff's race was visible and while similarly situated white users flagged under the same enforcement family were restored.

212.   As a direct and proximate result of Defendants' intentional and unjustified interference, Plaintiff suffered damages, including loss of existing and prospective business relationships, loss of revenue and business opportunities, loss of goodwill, and loss of approximately $3,000 in pending service requests, in amounts to be proven at trial.

## COUNT VII
### CONVERSION (Florida Common Law)
*(Against Meta Platforms, Inc.)*

213.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

214.   Plaintiff owned, created, and had the right to immediate possession of specific, identifiable property interests stored in and associated with his account access, including: (a) business communications and message threads;

(b) customer contact information and appointment-related communications stored in account communications; and (c) advertising campaign data and associated account-resident business records.

215.   On or about July 4, 2022, Meta permanently disabled Plaintiff's account access and withheld Plaintiff's ability to access, retrieve, possess, or control the property identified above. Meta thereby exercised dominion and control over Plaintiff's identifiable property inconsistent with Plaintiff's rights.

216.   Plaintiff sought restoration of account access and return of the property through the platform's appeal and identity-verification process, including submission of identity verification materials. Meta refused and continues to refuse to restore Plaintiff's access or return Plaintiff's identifiable property, and Plaintiff remains unable to access his account-resident business data and records.

217.   As a direct and proximate result of Meta's conversion, Plaintiff suffered damages, including loss of access to and use of the converted property, destruction of stored value, and consequential business harm, in amounts to be proven at trial.

## COUNT VIII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Florida Common Law)**
*(Against Meta Platforms, Inc. and Accenture LLP)*

218.   Plaintiff incorporates by reference all preceding paragraphs, including Sections A through K.

219.  On July 4, 2022, Defendants invoked Meta's Child Sexual Exploitation enforcement designation against Plaintiff without identifying any content that violated the policy, required Plaintiff to submit his U.S. passport as a precondition to final human review, and permanently disabled his accounts after a reviewer affirmed the CSE invocation with Plaintiff's profile photograph and government-issued identification visible at the decision point. Defendants routed the matter through a workflow that did not result in a NCMEC report. No law enforcement agency has contacted Plaintiff in more than three years.

220.  The permanent disablement branded Plaintiff under an enforcement category associated with child sexual exploitation, foreclosed his business operations and professional access, and carried consequences Defendants understood: attorneys who learn of a CSE designation refuse representation.

221.  Accenture participated in the enforcement pipeline that originated the CSE designation and staffed the final human review within Meta's enforcement framework. More than three years later, and after Plaintiff disclosed his CSA-survivor status, Accenture published on a public federal docket the assertion that Plaintiff committed "a legitimate community standards violation" without identifying any content, standard, or factual basis, while repeatedly pairing Plaintiff's name with CSE terminology. Accenture published this assertion after its counsel acknowledged in writing that no CSE violation occurred. Accenture's second filing revised the assertion but again identified nothing. Neither assertion has been clarified, substantiated, or withdrawn. These

publications converted the private enforcement harm into a public record and ratified the original CSE designation by asserting on a public docket that it reflected a "legitimate" violation Accenture could not and did not support.

222.  Taken together, Defendants' conduct constitutes a single course of conduct that exceeds all bounds of decency tolerated in a civilized community. Defendants branded Plaintiff under a child sexual exploitation enforcement category without identified content, required identity documents for a non-identified violation, and permanently excluded him while restoring similarly situated white users under the same enforcement family. A defendant that participated in the originating enforcement then published on a public federal docket that Plaintiff committed a "legitimate" violation, paired his name with CSE terminology, and did so after acknowledging no CSE violation—and after learning Plaintiff is a CSA survivor.

223.  Accenture's assertions were not pertinent to any defense raised in its Rule 12(b)(6) motions. No defense required asserting Plaintiff actually committed a violation. No defense required the CSE-adjacent pairings. To the extent any qualified privilege is asserted, Accenture acted with express malice: it published after acknowledging in writing that no CSE violation occurred, without identifying any content or standard, and with knowledge of Plaintiff's CSA-survivor status. The non-pertinency of the assertions and the absence of any identified content or standard support the inference that the primary

purpose was to injure Plaintiff or that Accenture acted with reckless disregard of that risk.

224.  Defendants intended to cause severe emotional distress or acted with reckless disregard of the high probability their conduct would do so. Defendants understood that a baseless CSE designation carries the stigma of association with child sexual exploitation and triggers foreseeable fear of criminal investigation under 18 U.S.C. § 2258A. Accenture understood that publicly asserting a "legitimate" violation and pairing Plaintiff's name with CSE terminology—after acknowledging no violation and after learning of Plaintiff's survivor status—would inflict acute distress.

225.  Defendants' conduct was a factual and proximate cause of Plaintiff's severe emotional distress. The distress originated with the July 4, 2022 enforcement event and was intensified by Accenture's October 2025 publications. Plaintiff, a CSA survivor branded under a child sexual exploitation category without basis and then subjected to public assertions that he committed a "legitimate" violation by a defendant that knew otherwise, suffered humiliation, mental anguish, and physical manifestations of distress of a nature no reasonable person should be expected to endure.

## COUNT IX

### CIVIL CONSPIRACY (Florida Common Law)
*(Against Meta Platforms, Inc., Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.)*

226.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

227.   Defendants reached an agreement and understanding to implement and carry out the July 4, 2022 account-level enforcement event through a joint platform policy enforcement pipeline in which Meta established enforcement guidelines and the Vendor Defendants staffed human reviewers for final enforcement decisions, with Meta retaining override authority, and in which the final-review step included identity-visible review and a discretionary routing determination at the enforcement chokepoint.

228.   In furtherance of the agreement and understanding, Defendants committed overt acts including: (a) invoking and applying a CSE enforcement designation to Plaintiff without identifying violative content; (b) requiring identity verification as a precondition to final human review; (c) conducting and/or affirming identity-visible final human review with Plaintiff's profile photograph and government-issued identification visible at the decision point; (d) ratifying permanent disablement under the CSE designation; (e) routing the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children; and (f) withholding Plaintiff's access to business communications, customer contact information, and advertising campaign data and records.

229.   Defendants conspired to commit, and did commit, unlawful acts and lawful acts by unlawful means, including the torts alleged in Count VI (Tortious

Interference with Business Relationships), Count VII (Conversion), and Count VIII (Intentional Infliction of Emotional Distress).

230.  As a direct and proximate result of the conspiracy and overt acts in furtherance thereof, Plaintiff suffered damages including economic injury, loss of business relationships, deprivation of identifiable property interests, loss of goodwill, and severe emotional distress, in amounts to be proven at trial.

### FLORIDA STATUTORY CLAIM (Damages + Declaratory + Injunctive Relief)
### COUNT X
### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Fla. Stat. § 501.204)
*(Against Meta Platforms, Inc., Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.)*

231.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

232.  Plaintiff is a person who suffered actual damages as a result of Defendants' unfair and deceptive acts or practices in the conduct of trade or commerce. Plaintiff lost money or property including loss of business data, customer communications, and foreclosed return on business investments. Meta and each Vendor Defendant engaged in trade or commerce within the meaning of Fla. Stat. § 501.203 by providing platform services, advertising services, and content-moderation services.

233.  Defendants engaged in deceptive acts or practices likely to mislead a consumer acting reasonably in the same circumstances by: (a) applying a CSE

enforcement designation to Plaintiff without identifying violative content; (b) requiring identity verification as a precondition to final review under that designation; (c) permanently disabling Plaintiff's account under the CSE designation while routing the enforcement matter through a non-report workflow inconsistent with the stated justification; and (d) in public filings, asserting that an unspecified "legitimate" community-standards violation by Plaintiff explained the enforcement, later revised to reference another unspecified standard, without identifying any content or standard. A reasonable consumer would be misled by a CSE designation that did not correspond to an actual CSE violation and that was not reported to NCMEC as would be expected for actual CSE violations under 18 U.S.C. § 2258A.

234. Defendants engaged in unfair practices that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers by: (a) permitting final reviewers to view users' race-identifying materials (profile photographs and government-issued identification) while making permanent-disablement decisions; (b) exercising discretion at the enforcement chokepoint to route matters into a non-report workflow or a reporting workflow without transparency; (c) permanently withholding users' account-resident business property after enforcement without providing a mechanism for return; and (d) maintaining these practices despite documented knowledge of disparate racial impact. These practices offend established public policy, including the policies expressed in 42 U.S.C. §§ 1981 and 1982, and cause substantial injury that

consumers could not reasonably avoid and that is not outweighed by any countervailing benefit.

235.  Defendants' conduct was unconscionable in that Defendants exercised enforcement discretion for some users flagged under the same enforcement family during the same general period while permanently excluding Plaintiff, and in that the CSE designation carried extraordinary stigma and foreseeable consequences that Defendants understood and imposed without identifying violative content.

236.  Defendants' deceptive, unfair, and unconscionable acts and practices were a direct cause of Plaintiff's actual damages.

237.  As a direct result, Plaintiff suffered actual damages including loss of business data, customer communications valued at approximately $3,000, foreclosed return on approximately $20,000 in business investments, loss of business relationships and revenue, and additional damages to be proven at trial.

238.  Plaintiff seeks declaratory and injunctive relief under Fla. Stat. § 501.211(1) in addition to actual damages under § 501.211(2). The declaratory and injunctive relief sought under § 501.211(1) is available "without regard to any other remedy or relief to which a person is entitled." The relief sought targets ongoing, systems-level practices requiring prospective changes to Defendants' enforcement architecture that cannot be compensated through monetary damages.

## DECLARATORY AND INJUNCTIVE RELIEF UNDER FDUTPA
## (Fla. Stat. § 501.211(1))
### Orders Against Meta Platforms, Inc.:

239. **Public Transparency Dashboard:** Within 120 days, Meta must establish and maintain a publicly accessible dashboard, updated at least quarterly, reporting the following metrics for every enforcement policy category under which Meta permanently disables account access or functionality: (a) total enforcement actions by category and platform; (b) total permanent account disablements by category; (c) total requests for review received and percentage restored by category; (d) percentage of human reviews where user-identifying information was visible to reviewers at decision point; (e) for any category with statutory reporting obligations, the ratio of enforcements to statutory reports filed. The dashboard must display all existing enforcement categories without exception, include any new categories within 30 days of implementation, maintain a rolling five-year historical view, provide downloadable raw data in machine-readable format, and include methodology documentation.

240. **CyberTipline Status Portal:** Establish within 120 days a user-accessible portal where any U.S. user with prior account-administration rights over a disabled account may request and receive within 30 days: (a) whether a NCMEC report was filed regarding their account (yes/no); and (b) the date of any such filing.

241. **Data Export for Permanently Disabled Accounts:** For any account permanently disabled, Meta must provide the individual who held prior

account administration rights, upon request within 14 days, a machine-readable export of account-resident data the user created or received. Exceptions to export include: (a) communications made by persons over the age of 18 with accounts administered by users under the age of 18; (b) content depicting, describing, or relating to minors; (c) content forming the basis of reports to NCMEC, law enforcement, or child-safety organizations; (d) content under active law enforcement preservation. For excepted content, Meta must provide a log detailing quantity and categories of withheld materials.

242. **Enhanced Transparency Reporting for CSE Enforcement:** Meta must expand the publicly posted transparency reports to include, for child sexual exploitation enforcement, retroactive to January 1, 2020 and continuing quarterly: (a) account-level enforcement actions disaggregated by race, age bracket, and gender; (b) NCMEC CyberTipline reports filed, disaggregated by race; (c) comparison rates between enforcement actions and CyberTipline reports by race. Reporting must consist of aggregate, de-identified data only.

243. **Identity-Neutral Review for Safety Enforcement:** For safety enforcement including CSE, Meta must implement masking of identity-revealing imagery by default at every human review stage unless identity verification constitutes the specific task at that step. A reviewer who has viewed unmasked identity information in any non-identity-verification step cannot serve as the final decision-maker for that account.

244. **Audit Log Retention:** Meta must maintain for five years audit logs sufficient to show for any human review: (a) timestamp of review; (b) reviewer role designation; (c) whether identity-revealing imagery was displayed; (d) written rationale if masking was lifted.

245. **Bias-Mitigation Training and Public Reporting:** Meta must conduct annual training for reviewers and supervisors on avoiding reliance on protected characteristics and publish annual public summaries including training completion rates, curriculum overview, and exception-use rate trends.

### Orders Against Vendor Defendants (Accenture LLP, Genpact USA, Inc., and TaskUs, Inc.):

246. **Final Review Transparency Statement:** Within 60 days, each Vendor Defendant must publish on its website a statement describing: (a) its role in Meta's final human review for policy enforcement during 2020–2025; (b) whether reviewers could view users' profile photos and government identification images during review; (c) bias-mitigation training in place during that period.

247. **Quarterly Metrics:** Publish quarterly: (a) total final reviews performed for Meta in safety policy enforcement categories; (b) percentage of final reviews in which identity-revealing imagery was displayed; (c) comparative affirmation rates when such imagery was visible versus masked.

248. **Implementation of Identity-Neutral Review Protocols:** When performing final review or other human review services for Meta's safety

enforcement, each Vendor Defendant must implement: (a) masking of identity-revealing imagery by default; (b) separation of identity-verification and decision-making functions; (c) two-key exception system for unmasking; (d) logging and five-year retention of exception use.

249. **Reviewer Training and Aggregate Reporting:** Each Vendor Defendant must conduct annual bias-mitigation training for reviewers and supervisors and publish annual public summaries showing training completion rates and exception-use rate trends.

250. **Vendor Accountability Disclosure:** Each Vendor Defendant must disclose annually the number of Meta account holders who contacted it directly seeking review or explanation of permanent exclusion decisions, and the number of such requests referred back to Meta without independent review.

## GENERAL PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      **DAMAGES** (Counts I through X)

Award compensatory damages in an amount exceeding $250,000,000, including but not limited to: (a) loss of existing and prospective business relationships; (b) loss of revenue, business opportunities, and goodwill; (c) loss of and deprivation of identifiable business property; (d) foreclosed return on business investments; (e) consequential damages; and (f) damages for severe emotional distress.

B.      **DECLARATORY RELIEF** (Counts I through V and Count X)

*DECLARE* that Defendants' operation of a platform policy enforcement system that permanently disabled Plaintiff's accounts under a CSE enforcement designation while restoring similarly situated white users violated 42 U.S.C. §§ 1981 and 1982.

*DECLARE* that the Vendor Defendants, while performing Meta's platform-policy enforcement services under contract with Meta, participated in discriminatory enforcement by affirming Plaintiff's CSE invocation while viewing users' race-identifying materials.

*DECLARE* that no NCMEC CyberTipline report was filed regarding Plaintiff's July 4, 2022 CSE enforcement action by Meta Platforms, Inc. or any Vendor Defendant, and that the Meta-vendor enforcement workflow did not result in any such report.

*DECLARE* that Plaintiff owns his account-resident business property and that Defendants' withholding of such property while maintaining disparate restoration practices violates 42 U.S.C. § 1982.

*DECLARE* that Defendants' acts and practices described herein violate the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204.

## C.    PUBLIC INJUNCTIVE RELIEF (Counts I through V)

Grant the public injunctive relief set forth in this Complaint, including orders requiring: (a) a public transparency dashboard; (b) a CyberTipline status portal; (c) data export for permanently disabled accounts; (d) identity-neutral review protocols; (e) audit log retention; (f) bias-

mitigation training and reporting; and corresponding orders against
Vendor Defendants including final review transparency statements,
quarterly metrics, identity-neutral review protocols, reviewer training, and
vendor accountability disclosures.

### D.    FDUTPA DECLARATORY AND INJUNCTIVE RELIEF

(Count X)

Grant the declaratory and injunctive relief under Fla. Stat. § 501.211(1) as set
forth in this Complaint.

### E.    ATTORNEYS' FEES AND COSTS

Award Plaintiff attorneys' fees under 42 U.S.C. § 1988 and Fla. Stat. § 501.2105,
plus costs of suit.

### F.    FURTHER RELIEF

Grant such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

251.  Plaintiff demands a jury trial on all issues so triable.[1]

---

[1] As a self-represented litigant, I learn every single day. Thusly, I had no idea that
I could file this complaint at home until around November 2025. I have
tremendous respect for the Court, the Judicial Process, and these United States
and convey this to allay any concerns that I may be engaging in questionable
conduct by re-litigating this case at home.

Dated: February 17, 2026                              Respectfully submitted,

_____

MARVELLE J. "JAY" BALLENTINE
Plaintiff, pro se
7862 W. Irlo Bronson Memorial Hwy
#82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com

Dated: February 17, 2026                    Respectfully submitted,

MARVELLE J. "JAY" BALLENTINE
Plaintiff, pro se
7862 W. Irlo Bronson Memorial Hwy
#82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com