**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARVELLE J. BALLENTINE,

*Plaintiff,*

v.

META PLATFORMS, INC., ACCENTURE LLP,

GENPACT LIMITED, and TASKUS, INC.,

*Defendants.*

Case No. 6:26-cv-00376-GAM-RMN

## FIRST AMENDED COMPLAINT FOR DAMAGES, PUBLIC
## INJUNCTIVE AND DECLARATORY RELIEF
### DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.    This case challenges Meta Platforms, Inc.'s calculated abuse of federal child-protection laws and its baseless CSE ("Child Sexual Exploitation") invocations used to eliminate business owners from Facebook's digital marketplace.

2.    Under the cover of protecting children, a cause no reasonable person would question, Meta and its enforcement vendors Accenture LLP, TaskUs, Inc., and Genpact (collectively, the "Vendor Defendants") operated a pipeline that

permanently branded innocent Black entrepreneurs as child predators while quietly restoring white users flagged under the same policy, including one with a confirmed CSE violation.

3.    In 2022, Meta made 105.9 million CSE enforcement actions but reported only 26 million to the National Center for Missing and Exploited Children as required by 18 U.S.C. § 2258A. Meta reported 25 percent of its CSE actions to law enforcement and left nearly 80 million unreported because no violation existed to report.

4.    Meta's platform-level data reveals the system's true purpose. Of the 105.9 million CSE actions, 92.2 million targeted Facebook's older user base while only 13.7 million targeted Instagram's younger, objectively higher-risk platform. This alignment with litigation exposure rather than child safety risk speaks for itself.

5.    The enforcement surge peaked at 30.1 million actions in Q3 2022 before collapsing 85 percent by early 2025—a temporary purge, not sustained safety enforcement. That same quarter, Meta reversed 4,000 CSE designations on Facebook, but only for users it chose to spare.

6.    Plaintiff Marvelle J. "Jay" Ballentine, a Black entrepreneur operating a Meta-approved advertising account for RV repair services, was caught in this system. His July 4, 2022 termination came days after his advertising found market traction, during the highest CSE enforcement quarter in Facebook's history.

7.     Meta issued Plaintiff a baseless CSE invocation. A Vendor Defendant reviewer conducting final human review affirmed the false designation with full access to Plaintiff's profile photo and government-issued identification, both plainly depicting a Black man. Plaintiff's permanent ban was affirmed within hours of submitting his passport.

8.     More than three years have passed. No law enforcement agency—local, state, or federal—has contacted Plaintiff. Meta filed no CyberTipline report. No violation existed to report.

9.     Throughout the relevant period, Meta restored white business owners, public figures, and one individual with a confirmed CSE violation, while permanently excluding Black business owners who had committed no violations.

10.     In 2022 alone, Meta reversed 8,100 CSE enforcement decisions on Facebook through human review. Meta maintained Plaintiff's permanent exclusion without reporting him to NCMEC, as federal law would require if a violation existed.

11.     The Vendor Defendants processed final enforcement outcomes with full knowledge of the disparities. Accenture earned 500 million dollars annually from this arrangement. TaskUs derived 28 percent of its total revenue from Meta. Genpact operated 1,600 reviewers in Hyderabad staffing Meta's enforcement queues. Accenture had publicly acknowledged that automated models produce "different degrees of wrongness for different people," yet Vendor

Defendant reviewers affirmed baseless CSE designations while staring directly at government IDs displaying users' Black faces.

12.     The baseless CSE invocation carries consequences Meta and the Vendor Defendants both intended and understood: when attorneys hear those three letters, they refuse representation. Meta achieved its desired outcome. Attorneys will not take Plaintiff's case.

13.     Plaintiff's business has been destroyed, his commercial property withheld, his access to continuing education severed, and his participation in digital commerce permanently foreclosed. It is against this backdrop that Plaintiff proceeds, pro se.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)-(4) (civil rights). Plaintiff's claims arise under 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3). This Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201-2202.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claims occurred in this District. Plaintiff resided in Florida at all relevant times, accessed Defendants' platforms and services from Florida, and suffered the injuries alleged herein in Florida.

## III.     STANDING

16.     Defendants' termination foreclosed Plaintiff's ability to realize any return on his $20,000 investment in RV repair equipment, training, and Meta

advertising by eliminating his sole customer acquisition channel. Plaintiff also lost $3,000 in pending transactions and access to the NRVTA Alumni Group required for continuing professional education and technical support.

17.    The Court can redress these injuries through damages, declaratory relief, and injunctive relief.

## IV.    PARTIES

### A.    Plaintiff

18.    Plaintiff Marvelle J. "Jay" Ballentine is a Black individual who operated a mobile RV repair business in Florida.

19.    Plaintiff brings this action solely in his individual capacity. He asserts claims under 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3) and seeks compensatory damages, declaratory relief, and injunctive relief. He does not seek to represent, certify, or recover for any class under Rule 23(b)(1), (b)(2), or (b)(3). The structural remedies requested are tailored to redress Plaintiff's own injuries and operate, if at all, incidentally with respect to nonparties.

### B.    Defendants

20.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, California 94025.

21.    Defendant Accenture LLP is a limited liability partnership that operates platform policy enforcement services for Meta through facilities in multiple locations, employing approximately 5,800 reviewers dedicated exclusively to Meta's platforms.

22.    Defendant TaskUs, Inc. is a Delaware corporation with its principal place of business in Texas. TaskUs provides content-moderation and trust-and-safety services for Meta, including staffing of enforcement queues relevant to this action. The International Association of Outsourcing Professionals recognized the Meta–TaskUs partnership for operational integration in 2022. TaskUs disclosed in SEC filings that Meta comprised 22% of its fiscal year 2024 revenue.

23.    Defendant Genpact Limited ("Genpact") is a professional-services entity with its principal place of business in New York. Genpact provides content-moderation and trust-and-safety services for Meta, including staffing of enforcement queues relevant to this action. By 2019, Genpact operated a team of approximately 1,600 reviewers in Hyderabad performing Facebook content review in English, Indian languages, Arabic, and other regional dialects.

### C.    Defined Terms

24.    Accenture LLP, TaskUs, Inc., and Genpact are referred to collectively as the "Vendor Defendants."

25.    Meta Platforms, Inc. and the Vendor Defendants are referred to collectively as "Defendants."

### D.    Personal Jurisdiction over Vendor Defendants

26.    Each Vendor Defendant purposefully availed itself of the privilege of conducting activities directed at the United States, including Florida, by entering and maintaining services agreements with Meta to staff content-enforcement

6

queues for the Facebook platform serving users nationwide; receiving Meta-issued standard operating procedures, training, and quality-assurance direction; and participating in weekly calls, regular site visits, and monthly and quarterly business reviews with Meta personnel regarding enforcement operations affecting users in all fifty states, including Florida. Plaintiff's claims arise out of or relate to those activities. Exercising jurisdiction comports with due process. In the alternative, for Plaintiff's federal claims, personal jurisdiction lies under Fed. R. Civ. P. 4(k)(2) because Plaintiff's claims arise under federal law, no state court of general jurisdiction can exercise jurisdiction over all Vendor Defendants, and each Vendor Defendant has sufficient aggregate contacts with the United States as a whole.

### E.    Joinder

27.    Joinder is proper under Fed. R. Civ. P. 20(a)(2) because claims against Meta and the Vendor Defendants arise out of the same transaction or series of transactions (the design and execution of Meta's CSE enforcement workflow) and share common questions of law and fact.

## V. FACTS

### A.    PARTIES AND FOUNDATION

28.    Plaintiff Marvelle J. "Jay" Ballentine is a Black business owner who domiciled in Florida and operated his mobile RV repair business in Florida and surrounding states at all times relevant to this action.

29.     Plaintiff created his Facebook account in late 2004 or early 2005 on "TheFacebook.com."

30.     Defendant Meta Platforms, Inc. operates Facebook and Instagram, serving over 3 billion users globally and generating $116.6 billion in revenue in 2022, with 97.5% derived from advertising.

31.     Public reporting indicates Facebook entered into a business arrangement with Accenture around 2012. A 2021 New York Times examination estimated the value of Facebook's contracts with Accenture for platform policy enforcement services at least $500 million per year.

32.     Accenture operates platform policy enforcement services for Meta through facilities in Austin, Texas; Dublin, Ireland; Manila, Philippines; and other locations, employing approximately 5,800 reviewers dedicated exclusively to Meta's platforms, including work performed from Meta's Fremont (Alameda County) campus through at least January 2023.

33.     Accenture reviewers performed final-review and disposal of cases based on Meta's guidelines. Meta retained override authority.

### B.     CSE PIPELINE—SCALE & REPORTING DISCRETION

34.     In 2022, Meta actioned approximately 105.9 million items under its "Child Sexual Exploitation" (CSE) enforcement category across Facebook and Instagram. Of these, 92.2 million occurred on Facebook and 13.7 million on Instagram.

35.     That same year, Meta submitted approximately 26 million CyberTipline reports to the National Center for Missing and Exploited Children (NCMEC) pursuant to 18 U.S.C. § 2258A. No alternative reporting mechanism exists under federal law.

36.     The difference between the 105.9 million CSE-labeled enforcement actions and the approximately 26 million NCMEC reports reflects nearly 80 million CSE-labeled actions that were not referred to NCMEC. Section 2258A leaves "apparent violation" determinations to the provider's discretion.

37.     Meta's public disclosure states: "Electronic Service Providers (ESPs) are legally obligated to report apparent violations of laws related to child sexual abuse material (CSAM) they become aware of to NCMEC's CyberTipline."

38.     Meta's CSE enforcement policy states it removes content that "sexually exploits children." Meta states it "report[s] apparent child exploitation to the National Center for Missing and Exploited Children (NCMEC)."

39.     Section 2258A requires reporting "as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances from which there is an apparent violation" of child exploitation laws. Meta retained discretion over which CSE-labeled enforcement actions resulted in permanent account terminations, which were referred to law enforcement, and which were restored. These decisions occurred after the user's identity, including race, was visible to Meta and its enforcement partners.

40.    For the approximately 80 million CSE enforcement actions Meta did not report to NCMEC in 2022:

(a) Meta identified apparent violations of child exploitation laws in these actions but did not report them to NCMEC; or

(b) Meta applied its CSE enforcement category to these actions despite identifying no apparent violations of child exploitation laws.

41.    Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

## C.    ENFORCEMENT MECHANICS

42.    Meta and the Vendor Defendants operated a joint platform policy enforcement pipeline in which Meta established policy enforcement guidelines while the Vendor Defendants staffed human reviewers for final policy enforcement decisions. Within this pipeline, the Vendor Defendant conducting final review executed the routing determination at the final step described in ¶45 that decided whether a case proceeded into the CyberTipline reporting workflow under 18 U.S.C. § 2258A, or into an alternate workflow. Meta retained override authority.

43.    Accenture billed Meta approximately $50 per hour for each human reviewer while paying them approximately $18 per hour. TaskUs disclosed in SEC filings that Meta comprised 22% of its fiscal year 2024 revenue. Genpact

operated approximately 1,600 reviewers in Hyderabad dedicated to Facebook content review by 2019.

44. Vendor Defendant personnel performing final-review enforcement had access to account-level identifiers, including profile photos, names, and in some cases government-issued ID images, sufficient to reveal a user's race. The CSE designation was affirmed by a vendor reviewer who, during the identity verification process, had full visibility of Plaintiff's Black face through his profile photo and government-issued ID.

45. Following affirmation of the CSE designation, the reviewing Vendor Defendant executed the operational decision that determined whether Plaintiff's case would: (a) enter the NCMEC reporting workflow triggering mandatory law enforcement notification under 18 U.S.C. § 2258A; or (b) bypass law enforcement entirely through an alternative workflow. This routing decision placed the reviewing Vendor Defendant at the chokepoint between platform enforcement and criminal investigation.

### D.    BIAS KNOWLEDGE

46. In 2018, Accenture publicly framed algorithmic "fairness" as measuring outcomes "for different people" and acknowledged that automated models can be "wrong" more often for some groups. Its Responsible AI leadership stated there is "no such thing as a perfect algorithm" and warned that models exhibit different error rates "for different people, based on characteristics that should not influence outcomes."

47.    In 2019–2020, Meta commissioned and received a Civil Rights Audit that documented "false positive" removals affecting African American users and warned that algorithmic moderation could exacerbate racial inequities. The auditors also noted Meta did not maintain robust protected-class measurement for enforcement, limiting diagnosis of disparate impact.

48.    Between 2019 and 2021, Meta conducted 'Project WoW,' surveying 10,000 users and determining that its algorithms were better at detecting hate speech against white people but worse at detecting hate speech against people of color. When Meta researchers proposed corrections to this documented racial bias, Meta Vice President of Global Public Policy Joel Kaplan blocked deployment of the remediation in 2021.

49.    Meta's Transparency Center discloses restoration statistics, demonstrating institutional policy enforcement discretion.

## E.    PLAINTIFF'S SEQUENCE

50.    Plaintiff, having no prior blue-collar experience, enrolled in the National RV Training Academy specifically because NRVTA certification provided contractual rights to continuing education through the NRVTA Alumni Facebook Group, the sole professional development network providing continuing education and field support essential for competent RV repair services.

51.    Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's marketing and networking capabilities.

52.    At the time of his account termination, Plaintiff sourced 100% of all his clients and leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000. Plaintiff agreed to engage in future customer service contracts with foreknowledge that he would have to rely on continuing education benefits conferred to him by the NRVTA.

53.    In June 2022, Plaintiff began marketing his RV repair business on Facebook and paid to access tools and services delivered through his Facebook for Business account. Meta billed his credit card in accordance with his 'Facebook for Business' account activity between June 27, 2022 to June 30, 2022.

54.    On July 4, 2022, Meta baselessly invoked its CSE policy against Plaintiff and requested identity verification as a precondition to final human review. Plaintiff submitted his U.S. passport, which displayed the image of a Black man.

55.    The Vendor Defendant reviewer conducting Plaintiff's review had Plaintiff's government-issued identification and profile photograph visible

during review and was authorized to validate or invalidate Meta's invocation of its Child Sexual Exploitation (CSE) policy.

56.    Within hours of receiving Plaintiff's identification, Meta ratified the permanent termination and routed the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children.

57.    The July 4, 2022 termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, advertising campaign data, and access to the NRVTA alumni group for continuing education. Plaintiff registered for a new Facebook account in April 2023 in order to access continuing education through the NRVTA Alumni Facebook Group. Meta promptly terminated the new account before Plaintiff could publish any content.

### F.    MOTIVE, CONTRACT, AND PROPERTY DEPRIVATION

58.    Meta's enforcement systems generated documented false positives across all policy categories. The Civil Rights Audit confirmed these false positives disproportionately affected Black users. On information and belief, each false positive on a business account created potential liability for wrongful termination, contract interference, and discrimination claims.

59.    On June 9, 2022, Plaintiff received his first email from 'Meta for Business,' the rebranded successor to Facebook for Business, marking his first commercial interaction with Meta since 2017 when he operated under terms

requiring court jurisdiction. This renewed engagement subjected Plaintiff to Meta's Commercial Terms containing a 30-day arbitration opt-out clause.

60.    On June 16, 2022, Meta restricted Plaintiff's dormant Meta for Business account, which contained no content, no advertisements, and no transactions, citing 'violations of our Advertising Policies or Community Guidelines.' Meta sent Plaintiff a message indicating the restriction could be lifted if Plaintiff complied with 'increased security requirements for Business Accounts' within five hours. Plaintiff was required to supply and validate his phone number as a precondition for compliance with said increased security requirements. Plaintiff complied.

61.    The contractual relationship between Plaintiff and Meta (Facebook for Business) was consummated between June 27-30, 2022 when Meta billed Plaintiff's credit card for services delivered. Meta terminated his Facebook and Facebook for Business account on July 4, 2022 before Plaintiff could exercise his contractual right to opt-out of arbitration.

62.    ALTERNATIVE PLEADING: Either (a) Meta contends Plaintiff accepted Commercial Terms, but then rendered the 30-day opt-out right meaningless by terminating his account before Plaintiff could exercise his opt-out rights; OR (b) Meta contends no Commercial Terms acceptance occurred by July 4, meaning no advertising arbitration governed the termination.

63.    Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's

marketing and networking capabilities. At the time of termination, Plaintiff sourced 100% of all his client contacts and leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000.

64.    Plaintiff held multiple property interests through Meta's platforms: business communications documenting $3,000 in pending transactions; customer relationships generating 100% of business leads; administrative credentials controlling these assets; advertising campaign data; and access to the NRVTA Alumni Group providing continuing education and field support essential to competent business operations. These interests satisfied all property criteria: precise definition, exclusive control, legitimate exclusivity.

65.    The termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, and severed access to the NRVTA Alumni Group, the sole source of continuing education and technical consultation enabling Plaintiff to safely perform repairs.

66.    Meta terminated these property rights July 4, 2022. The termination destroyed stored value. The termination severed commercial relationships. The termination eliminated business operations. The termination foreclosed on Plaintiff's ability to derive the contractual benefits as conferred to him by the NRVTA.

67. Meta's deployment of the CSE designation foreclosed review, as its strikes policy allows account disablement after one occurrence for CSE violations. Yet Meta, through its partner Accenture, reversed 8,100 CSE enforcement actions in 2022, including 4,000 during Q3 when Plaintiff's property and contract interests were severed, the most reversals in its documented history. Despite this demonstrated discretion, more than three years have elapsed without Meta returning Plaintiff's business data or restoring his right to make and modify contracts.

68. On April 22, 2025, Plaintiff demanded reinstatement of his account; Meta did not restore access.

### G. COMPARATORS

| Name | Race | Type | Violation | Reinstated |
|------|------|------|-----------|-----------|
| Marvelle J. Ballentine | *Black* | *Business Owner* | ***NON-EXISTENT*** | *No* |
| Steven Ertelt | *White* | *Organization/Business Page* | ***CSE flag (medical C-section video)*** | *Yes* |
| COMP-1 | *White* | Individual | *Confirmed CSE* | *Yes* |
| Abby Covington | White | Individual (Adoption Page) | Human Exploitation | Yes |
| @slut.social | White | Content Creator | Sexual Content/Adult Nudity/Solicitation | Yes |

| Betty Tompkins | White | Artist (Commercial) | Nudity/Sexual Content (artistic) | Yes |
|---|---|---|---|---|

69.     From 2020 to 2025, each entity identified in the matrix was enforced within Meta's sexual-content and Child Sexual Exploitation enforcement family. Each matter proceeded through Meta's enforcement apparatus, including vendor-staffed review queues, to human review, including final decisions. Individual accounts displayed race through profile photographs or identity materials. Organizational accounts were white-led entities as reflected in public reporting.

70.     In early 2025, Plaintiff discovered that Steven Ertelt's account was flagged under the CSE policy for a medical C-section video. Meta restored Steven Ertelt's account, after receiving a reinstatement demand from his counsel. On April 22, 2025, Plaintiff submitted a formal reinstatement demand to Meta in which Meta constructively denied.

71.     COMP-1's case reveals the discretionary nature of Meta's CSE enforcement apparatus. On or around September 3, 2024, Plaintiff discovered a post published to the X Platform (formerly known as Twitter) which showed that on October 17, 2020, COMP-1 posted content that Meta subsequently confirmed constituted a CSE violation.

72.     COMP-1 received a temporary suspension and was reinstated after Meta's CSE confirmation. Meta's own review stated: "We confirmed that it does

not follow our Community Standards on child sexual exploitation." Yet Meta imposed only a temporary suspension on COMP-1's account. COMP-1's restoration after Meta-confirmed CSE policy violation demonstrates discretion over sanctions and restoration.

73.    Meta restored contractual status for the white comparators despite the cited violations. Plaintiff remains permanently excluded from the platform and its commercial infrastructure. Plaintiff's contractual relationship with Meta has not been restored. Plaintiff's access to the contractual rights conferred to him by NRVTA remains severed. Plaintiff's property remains withheld.

## H.    §1983 STATE-ACTION / GOVERNMENTAL NEXUS

74.    Electronic communication service providers must report apparent child exploitation violations to the National Center for Missing and Exploited Children upon obtaining actual knowledge. 18 U.S.C. § 2258A. Meta operates as such a provider. NCMEC operates under congressional charter, 42 U.S.C. § 5773, and serves as the exclusive clearinghouse for these reports.

75.    Section 2258A(g)(3) expressly authorizes NCMEC to forward reports to state and local law enforcement. All fifty states operate Internet Crimes Against Children task forces that receive and investigate these reports. California's ICAC Task Force operates in Meta's home jurisdiction and depends on Meta's reports for case origination.

76.    In 2022, Meta made 105.9 million CSE enforcement actions across its platforms. Meta reported approximately 26 million items to NCMEC that

same year. The difference reflects nearly 80 million CSE-labeled actions that Meta did not report to law enforcement.

77.    Meta exercised pure discretion over which CSE-labeled enforcement actions to report to NCMEC, which to withhold from law enforcement, and which resulted in permanent account terminations. These decisions occurred after users' identities, including race, were visible to Meta and its enforcement partners.

78.    Meta's reporting decision determines who faces criminal prosecution. State ICAC units investigate what Meta reports. They cannot investigate what Meta withholds. Report to NCMEC means state investigation follows. No report means no investigation occurs.

79.    Section 2258A(h) mandates one-year evidence preservation after a report. This preservation serves state prosecutions. State investigators access this evidence through NCMEC. Meta controls what evidence is preserved and what is destroyed.

80.    The nearly 80 million unreported CSE flags were not transmitted to state investigators. The 26 million reported flags were transmitted to state investigators. Defendants made these determinations within Meta's enforcement framework, with a Vendor Defendant executing the routing described in ¶45 and Meta retaining override authority.

81.    State law enforcement restructured investigations around platform reports. They depend on CyberTipline submissions. Meta's reporting decisions

determine which cases enter state criminal systems. Meta performs prosecutorial triage.

82.    Within Meta's enforcement framework, a Vendor Defendant executed the routing decision that determined which CSE-labeled cases entered the NCMEC reporting workflow and which bypassed law enforcement entirely. This routing function, described in ¶46, placed a Vendor Defendant at the chokepoint between platform enforcement and state investigation.

83.    A Vendor Defendant's routing decision determined which users would face state investigation. Cases routed to the NCMEC workflow triggered state law enforcement review. Cases routed to the alternative workflow did not. Meta retained override authority, but a Vendor Defendant's routing was the operational gateway between platform enforcement and state action.

84.    Either a Vendor Defendant routed Plaintiff's case to the NCMEC workflow and Meta submitted a CyberTipline report, or a Vendor Defendant routed the case through the alternative workflow and no report was submitted. If a Vendor Defendant routed to the NCMEC workflow and Meta submitted a report, NCMEC disseminated it to Florida law enforcement under § 2258A(g)(3), triggering state investigative processes and making Defendants and state agencies joint actors.

85.    Either Defendants reported Plaintiff to NCMEC and triggered state investigation, making them joint actors with state agencies, or they invoked federal criminal authority without reporting any crime, making the CSE

designation pretextual. More than three years have passed since July 4, 2022 without law enforcement contact, demonstrating no report was filed.

86.    First, the deprivation resulted from state-created authority. The statutory scheme under § 2258A makes Meta's reporting decisions determinative of criminal investigations. State agencies depend on Meta's reports. The statutory framework created the deprivation.

87.    Second, Defendants acted as state actors by screening cases for prosecution. State agencies delegated this screening authority through systematic reliance on NCMEC routing. A Vendor Defendant's routing decision and Meta's reporting determination jointly select which cases enter the prosecutorial pipeline. This is active participation in law enforcement, not mere regulatory compliance.

88.    Within this framework, Defendants exercise three powers: determining apparent criminal violations (through a Vendor Defendant's routing and Meta's reporting decisions), controlling evidence through mandatory preservation, and initiating state criminal process.

89.    Defendants' CSE decisions directly control state criminal justice. A Vendor Defendant's routing decision and Meta's reporting determination trigger investigations, preserve evidence under § 2258A(h), and determine who faces prosecution. Defendants exercise prosecutorial screening power that exceeds platform policy enforcement. The state delegated these powers through the statutory framework and systematic reliance on Defendants' determinations.

90.     Defendants terminated Plaintiff's account July 4, 2022, invoking its CSE policy after his government ID was viewed, displaying the face of a Black man. A Vendor Defendant's reviewer affirmed the baseless CSE invocation after viewing Plaintiff's identification, while during the same period, Defendants restored white users flagged under the CSE policy but maintained Plaintiff's permanent exclusion.

## I.      SCIENTER AND AGREEMENT

91.     In 2018, Accenture publicly acknowledged that automated models produce "different degrees of wrongness for different people." Accenture's Responsible AI leadership stated there is "no such thing as a perfect algorithm" and warned that models exhibit different error rates "for different people, based on characteristics that should not influence outcomes."

92.     Between 2019 and 2020, Meta commissioned and received a Civil Rights Audit that documented "false positive" removals disproportionately affecting African American users. The audit warned that algorithmic moderation could exacerbate racial inequities. The Civil Rights Audit further noted that Meta did not maintain robust protected-class measurement for enforcement actions, limiting the company's ability to diagnose disparate impact across racial groups.

93.     Meta's Transparency Center states the company does not offer appeals for violations with "extreme safety concerns, such as child exploitation imagery." Meta's strikes policy provides that accounts "may be disabled after one occurrence" for severe violations including child sexual exploitation.

94.    In 2022, Meta actioned approximately 105.9 million items under its Child Sexual Exploitation enforcement category across Facebook and Instagram.

95.    Upon actioning these 105.9 million items, Meta obtained actual knowledge of each flagged item and faced a decision whether to report it to the National Center for Missing and Exploited Children under 18 U.S.C. § 2258A. Meta chose not to report Plaintiff to the National Center for Missing and Exploited Children.

96.    Meta reported approximately 26 million items to NCMEC in 2022, and did not report approximately 80 million items that had been actioned under the CSE enforcement category.

97.    Meta reversed 993,400 CSE enforcement actions on Facebook in 2022. Of these reversals, 985,300 occurred without user initiated reviews and 8,100 occurred following final human review through the Defendants' joint policy enforcement framework.

98.    Meta reported approximately 25% of its CSE enforcement actions to NCMEC in 2022. On January 31, 2024, Meta CEO Mark Zuckerberg testified before Congress that Meta reports "all apparent" CSE content to NCMEC. This representation was reiterated in Meta's April 19, 2024 submission to the Senate Judiciary Committee.

99.    Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

100.  Since 2012, Meta and Accenture have maintained a business arrangement. Public reporting valued this relationship at approximately $500 million for Accenture's performance and delivery of platform policy enforcement services in 2021.

101.  Public reporting characterized Accenture as Facebook's single biggest partner in platform enforcement. The Meta-Accenture relationship constitutes a strategic partnership involving joint development of solutions, shared business development opportunities, and multi-year collaborative planning that "redefined the traditional boundaries of an outsourcing relationship."

102.  TaskUs, Inc. has provided content-moderation and trust-and-safety services to Meta since at least 2019. The International Association of Outsourcing Professionals recognized the Meta-TaskUs partnership for operational integration in 2022.

103.  TaskUs disclosed in its SEC filings that its largest client comprised 22% of fiscal year 2024 revenue. That client was Meta Platforms, Inc. TaskUs reported approximately $995 million in total revenue for fiscal year 2024.

104.  Genpact has provided content-moderation and trust-and-safety services to Meta during the period relevant to this action. By 2019, Genpact operated a team of approximately 1,600 reviewers in Hyderabad performing Facebook content review.

105.  Genpact's Hyderabad team reviewed content in English, Indian languages, Arabic, and other regional dialects.

106.  Meta conducts weekly calls, regular site visits, and monthly and quarterly business reviews led from California with its moderation vendors regarding enforcement operations. These reviews included Meta personnel based in California. Meta issued standard operating procedures, quality assurance protocols, and policy updates to each Vendor Defendant from California.

107.  Facebook employees directly trained Accenture reviewer teams at facilities in Manila, Philippines and Warsaw, Poland, providing instruction on Meta's policies and review procedures. Accenture dedicated approximately 5,800 reviewers exclusively to Meta's platform review queues during the relevant period.

108.  TaskUs operated moderation teams in the Philippines and in the United States, including Texas, that staffed Meta enforcement queues during the relevant period. TaskUs reviewers received Meta-provided standard operating procedures, policy updates, and training materials for CSE-labeled enforcement matters.

109.  Genpact operated moderation teams in Hyderabad, India that staffed Meta enforcement queues during the relevant period. Genpact reviewers received Meta-provided standard operating procedures, policy updates, and training materials for CSE-labeled enforcement matters.

110.   Accenture reviewers used Meta-provided account-review tools when conducting enforcement reviews within Meta's enforcement framework. Meta retained authority over Accenture's policy enforcement determinations while Accenture exercised operational discretion in conducting final human review of platform policy violations and edge cases.

111.   TaskUs reviewers used Meta-provided reviewer interfaces when performing review of CSE-labeled matters. Meta retained authority over TaskUs policy enforcement determinations while TaskUs exercised operational discretion in conducting final human review.

112.   Genpact reviewers used Meta-provided reviewer interfaces when performing review of CSE-labeled matters. Meta retained authority over Genpact policy enforcement determinations while Genpact exercised operational discretion in conducting final human review.

113.   Meta's enforcement systems include fields sufficient to identify whether a review was performed by vendor personnel and, if so, by which vendor.

114.   Accenture's platform policy enforcement positions require reviewers to exercise 'strong critical thinking and decision-making skills' in investigating, resolving, and relaying complex enforcement issues while applying client guidelines. Accenture reviewers conducting final review could view users' government-issued identification displaying racial characteristics when making client guided enforcement decisions.

115.    Vendor Defendant reviewers reviewing enforcement decisions had immediate access to users' profile photographs displaying racial characteristics before any identity verification request was initiated. When Meta requested government identification from users requesting review of CSE determinations, Vendor Defendant reviewers conducting final review could see the face photograph on the submitted identification document.

116.    In July 2022, when a CSE enforcement case was opened in the reviewer interface used by TaskUs, the affected user's profile photograph was displayed by default. When Meta requested government identification, the submitted image was visible to the TaskUs reviewer.

117.    In July 2022, when a CSE enforcement case was opened in the reviewer interface used by Genpact, the affected user's profile photograph was displayed by default. When Meta requested government identification, the submitted image was visible to the Genpact reviewer.

118.    Final review outcomes by Accenture personnel influenced whether a CSE-labeled matter was routed to the CyberTipline Reporting Workflow or to a Non-Report Workflow, consistent with Meta SOPs and subject to Meta override.

119.    In July 2022, final review outcomes by TaskUs personnel influenced whether a CSE-labeled matter was routed to the CyberTipline Reporting Workflow or to a Non-Report Workflow, consistent with Meta SOPs and subject to Meta override.

120.   In July 2022, final review outcomes by Genpact personnel influenced whether a CSE-labeled matter was routed to the CyberTipline Reporting Workflow or to a Non-Report Workflow, consistent with Meta SOPs and subject to Meta override.

121.   Accenture LLP, TaskUs, Inc., and Genpact maintain—or can obtain from Meta Platforms, Inc.—review-session telemetry, tool-access logs, and queue-assignment records sufficient to determine whether any vendor reviewer accessed Plaintiff's account materials on July 4-5, 2022.

122.   Review-session telemetry, tool-access logs, and queue assignment records for July 2022 were subject to routine rotation or overwrite unless preserved by litigation hold.

123.   Meta, Accenture, TaskUs, and Genpact maintained and executed a common enforcement workflow in which vendor reviewers affirmed CSE-labeled outcomes and influenced routing after identity-revealing imagery was visible. Each vendor processed appeals, affirmed outcomes, and applied Meta's standard operating procedures as delivered from California.

124.   On July 4, 2022, the following sequence occurred: First, Plaintiff's profile photograph displaying his Black face was visible to the enforcement system. Second, Meta requested government-issued identification. Third, Plaintiff submitted his U.S. passport containing his photograph. Fourth, a Vendor Defendant reviewer viewed Plaintiff's Black face as his passport was

visible on screen, and affirmed the baseless invocation of Meta's Child Sexual Exploitation policy. Meta ratified the outcome.

## COUNT I

### VIOLATION OF 42 U.S.C. § 1981: Interference with Right to Make, Enforce, and Modify Advertising Contracts
### *(Against Meta Platforms, Inc.)*

125.   Plaintiff incorporates by reference Facts Sections A through G, and I.

126.   Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981.

127.   Meta Platforms, Inc. formed and enforced contracts with Plaintiff, including a longstanding account governed by Meta's terms and commercial service agreements which were consummated when Meta charged for, and delivered Meta for Business services between June 27 and June 30, 2022. These contracts provided Plaintiff access to paid advertising services and related business tools.

128.   On July 4, 2022, Meta sent Plaintiff a notice that it was severing Plaintiff's access to his Meta for Business and Facebook account via an entirely baseless invocation of its Child Sexual Exploitation (CSE) policy.

129.   Plaintiff immediately requested a review.

130.   Meta conditioned processing of the review on submission of government issued identification.

131.   Before any identity verification step, Meta reviewers had Plaintiff's profile photograph visible in the account interface. At the decision point during the review, Meta's human reviewers had both the profile photograph and the submitted identification visible on screen.

132.   Within hours of Plaintiff's identification submission, Meta upheld the permanent disablement and terminated Plaintiff's advertiser access and business tools.

133.   During the same enforcement window, similarly situated white users flagged under the same policy, including Steven Ertelt and the comparator account identified as COMP-1 in Section G, were restored while Plaintiff remained permanently disabled. Meta acted because of Plaintiff's race.

134.   Meta's termination and refusal to restore concerned the making and enforcing of Plaintiff's advertising contracts with Meta, including formation, performance, modification, termination, enforcement, and the enjoyment of benefits and privileges. The disablement cut off his ability to purchase and run ads and foreclosed his contractual right to modify the agreement by exercising the 30 day arbitration opt out afforded in Meta's Commercial Terms, because Meta terminated within the 30 day arbitration opt out period.

135.   But for Meta's race-based decision to uphold the permanent termination during review after viewing Plaintiff's identification, Plaintiff would have continued to modify and enjoy the benefits and privileges of his advertising

contract with Meta. Meta has not restored his access despite Plaintiff's April 22, 2025 reinstatement demand.

136.   The foregoing conduct constitutes race based interference with Plaintiff's right to make, enforce, and modify contracts in violation of 42 U.S.C. § 1981.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1981: Interference with Right to Make and Enforce Third-Party Contracts
*(Against Meta Platforms, Inc., Accenture LLP, Genpact Limited and TaskUs, Inc.)*

137.   Plaintiff incorporates by reference Facts Sections A through G, and I.

138.   Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981, which right is protected against racially motivated third-party interference.

139.   Before the disablement, Plaintiff sourced 100 percent of his clients and leads from Meta's platforms, had completed more than $2,000 in customer transactions through Facebook sourced leads, and had pending service appointments valued at approximately $3,000.

140.   Plaintiff held a contract with the National RV Training Academy that conferred continuing education and field support benefits through the NRVTA Alumni Facebook Group, which Plaintiff relied upon to competently perform RV repair services.

141.   Meta delivered Plaintiff notice of its CSE invocation upon Plaintiff's account and required government identification as precondition to final human review. Meta received Plaintiff's identification, and within hours ratified the invocation and severed Plaintiff's access to customer communications, his Facebook sourced sales pipeline, and the NRVTA Alumni Group.

142.   Vendor Defendant personnel conducted the final human review of Plaintiff's case within Meta's enforcement framework and affirmed the CSE invocation. Meta ratified the final outcome. Vendor Defendant reviewers had Plaintiff's profile photograph visible before enforcement and had his government identification visible at the decision point during the final review, and exercised discretion to affirm the CSE invocation in the absence of any specific grounds.

143.   During the same period, similarly situated white users identified in the Facts were restored while Plaintiff's ability to make and modify contracts remained severed. Defendants acted because of Plaintiff's race.

144.   Defendants' sequence of actions created substantial race based impediments to Plaintiff's ability to form, perform, and enforce contracts with existing and prospective customers by blocking him from responding to leads, confirming appointments, performing scheduled work, invoicing, collecting payment, and maintaining client relationships.

145.   Defendants' actions also prevented Plaintiff from accessing the NRVTA Alumni Group and receiving the continuing education benefits for which he had contracted.

33

146. But for Meta's race based disablement and refusal to restore, and but for a Vendor Defendant's final review affirmation at the decision point, Plaintiff would have continued to make new customer contracts, to perform and enforce existing agreements including the pending $3,000 in appointments, and to access his NRVTA contractual benefits.

147. Defendants' continued withholding of account access and business communications has further prevented Plaintiff from enforcing existing agreements and securing performance or payment from customers with whom he had been communicating at the time of disablement.

148. The foregoing conduct constitutes third party interference with Plaintiff's right to make and enforce contracts in violation of 42 U.S.C. § 1981.

## COUNT III

### VIOLATION OF 42 U.S.C. § 1982: Interference with Right to Hold and Convey Personal Property
*(Against Meta Platforms, Inc., Accenture LLP, Genpact Limited and TaskUs, Inc.)*

149. Plaintiff incorporates by reference Facts Sections A through G, and I.

150. Plaintiff is Black and asserts under 42 U.S.C. § 1982 the same right as white citizens to hold and convey personal property, which right is protected against racially motivated third-party interference.

151. Meta Platforms, Inc. permanently disabled Plaintiff's account on July 4, 2022 and has refused restoration, thereby blocking Plaintiff's possession, access, and use of account-resident business property, including customer

34

communications, pending appointments, saved campaigns and creative libraries, and administrative credentials controlling these assets, and cutting off Plaintiff's ability to access and use the records, materials, and communications housed in the NRVTA Alumni Group to which he had a right.

152.   Vendor Defendants staffed final human review within Meta's enforcement pipeline. On July 4, 2022, a Vendor Defendant reviewer conducted the initial profile review and final human review of Plaintiff's case, then affirmed the CSE invocation within Meta's framework.

153.   Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; following Plaintiff's account disablement, a similarly situated white Meta for Business account flagged under the same CSE policy—Steven Ertelt—was restored to full platform access and control of account-resident business property, while Plaintiff remained permanently excluded. Meta acted because of Plaintiff's race.

154.   Vendor Defendant's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the CSE invocation within Meta's enforcement framework without any identifying grounds because of Plaintiff's race.

155.   But for Meta's race-based disablement and refusal to restore, Plaintiff would have continued to hold, use, and convey his business property on Meta's platforms.

156.   But for Vendor Defendant's race-aware final-review affirmation on July 4, 2022, Meta would not have permanently deprived Plaintiff of his business property.

157.   The disablement and non-restoration deprived Plaintiff of possession and control of his business records, customer lists and receivables, administrative credentials; eliminated access to customer communications and pending appointments valued at $3,000; severed access to the records, materials, and communications housed in the NRVTA Alumni Group; and destroyed goodwill and revenue streams derived from Facebook-sourced customer relationships.

158.   The foregoing conduct constitutes interference with Plaintiff's right to hold and convey property in violation of 42 U.S.C. § 1982.

## COUNT IV

### VIOLATION OF 42 U.S.C. § 1983: Deprivation Of Constitutional Rights Under Color Of State Law
*(Against Meta Platforms, Inc., Accenture LLP, Genpact Limited and TaskUs, Inc.)*

159.   Plaintiff incorporates by reference Facts Sections A through I.

160.   Plaintiff is Black and brings this claim under 42 U.S.C. § 1983 for deprivation of rights secured by the Fourteenth Amendment, including Equal Protection, and, in the alternative, Procedural Due Process. Plaintiff alleges Meta and Vendor Defendant acted under color of law as set forth below.

161.   On July 4, 2022, Defendants permanently disabled Plaintiff's account invoking Meta's CSE policy without identifying any specific grounds and have refused reinstatement, including after Plaintiff's April 22, 2025 reinstatement demand. Meta's CSE lane offers no opportunity for account restoration; nonetheless, Defendants routed Plaintiff's case for internal final human review within the joint enforcement framework.

162.   In connection with the challenged enforcement, Meta and Vendor Defendants exercised discretionary authority inside a child-exploitation reporting and preservation pipeline that includes triage, classification, evidence preservation, and routing decisions whether to file and transmit CyberTipline reports and user data to NCMEC and law enforcement. Vendor Defendant's routing decision determined which cases entered the NCMEC reporting workflow and Meta's reporting decision determined whether CyberTipline reports were filed. Plaintiff alleges, in the alternative, that Defendants' enforcement is fairly attributable to the state because:

a. Vendor Defendants routed Plaintiff's case to the NCMEC workflow, Meta filed or caused to be filed a CyberTipline report concerning Plaintiff, and Defendants jointly participated with NCMEC and law enforcement in the resulting triage; or

b. Defendants acted pursuant to a statutory reporting and preservation regime that compelled and significantly encouraged the challenged conduct; or

c. Defendants' CSE enforcement and the routing function at the chokepoint described in ¶45 are pervasively entwined with law-enforcement-facing functions such that the state is responsible for the decision.

163.   Meta's decisionmakers and a Vendor Defendant's reviewer had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and contractual status while Plaintiff remained permanently excluded. Defendants acted because of Plaintiff's race.

164.   With respect to procedural due process (if reached), Plaintiff identifies protected interests in access to and use of account-resident business data, customer communications, pending appointments, receipts, audience and advertising assets, and associated contractual relationships. Defendants provided no timely or meaningful notice of specific grounds and no neutral pre- or post-deprivation opportunity to be heard before permanently impairing those interests.

165.   But for Defendants' race-based exercise of discretionary authority within the reporting and preservation pipeline, including Vendor Defendant's routing decision and Meta's reporting decision, and their disablement and refusal-to-restore decisions, Plaintiff would not have been deprived of equal protection, and, in the alternative, would not have been deprived of the identified property and contract interests without due process of law.

166.   Plaintiff suffered loss of contract and property interests, economic injury from the elimination of business access and use, and reputational harm associated with the CSE designation.

167.   The foregoing conduct by Meta Platforms, Inc. and Vendor Defendants, acting under color of state law, constitutes deprivation of Plaintiff's rights in violation of 42 U.S.C. § 1983.

**COUNT V**

**VIOLATION OF 42 U.S.C. § 1985(3): Conspiracy To Deprive Plaintiff Of Civil Rights**
*(Against Meta Platforms, Inc., Accenture LLP, Genpact Limited and TaskUs, Inc.)*

168.   Plaintiff incorporates by reference Facts Sections A through G, and I.

169.   Plaintiff is Black and asserts a claim under 42 U.S.C. § 1985(3) for a private conspiracy undertaken with class-based, invidiously discriminatory animus to deprive him of equal protection and equal privileges, including the rights secured by 42 U.S.C. §§ 1981 and 1982.

170.   Meta Platforms, Inc. agreed and acted to permanently exclude Plaintiff from its platforms and business tools: on July 4, 2022 Meta imposed a permanent severance after invoking its Child Sexual Exploitation policy without identifying any specific grounds; Meta thereafter refused reinstatement, including after Plaintiff's April 22, 2025 reinstatement demand. These acts furthered the agreement's objective by preventing Plaintiff from making and

enforcing contracts and from holding and using his account-resident business property.

171.    Vendor Defendants joined and acted in furtherance of the agreement by staffing final human review within Meta's enforcement pipeline. On July 4, 2022, Meta routed Plaintiff's case to a Vendor Defendant for final human review. The review was conducted in adherence to Meta's policy enforcement guidelines. The Vendor Defendant reviewer affirmed the CSE invocation which resulted in a permanent severance within Meta's policy enforcement framework.

172.    Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and control over account-resident business property while Plaintiff remained permanently excluded. Meta acted with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

173.    Vendor Defendant's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the CSE invocation within Meta's enforcement framework with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

174.   But for Meta's agreement and acts in furtherance, including the permanent disablement and refusal to restore, Plaintiff would not have been deprived of equal protection and of the rights secured by §§ 1981 and 1982.

175.   But for Vendor Defendant's agreement and discrete act in furtherance—its race-aware initial, and final-review affirmation of the baseless CSE invocation on July 4, 2022—Meta would not have permanently deprived Plaintiff of his contractual and property rights.

176.   Plaintiff suffered loss of contract and property interests, eliminated access to customer communications and pending appointments, severed access to the NRVTA Alumni Group essential to his business operations, and destroyed goodwill and revenue streams derived from Facebook-sourced customer relationships.

177.   The foregoing conduct constitutes a conspiracy to violate civil rights under 42 U.S.C. § 1985(3).

### **GENERAL PRAYER FOR RELIEF**

WHEREFORE, as to Counts I through V, Plaintiff respectfully requests this Court:

### I. DAMAGES (Counts I-V)

178.   Award compensatory damages on all counts in an amount not less than $500,000,000, including but not limited to: loss of existing and prospective business relationships; loss of revenue, business opportunities, and goodwill; loss of and deprivation of identifiable business property; foreclosed

return on business investments; consequential damages; damages for injury to reputation; and damages for severe emotional distress.

## II. DECLARATORY RELIEF (Counts I-V)

179.  DECLARE that Defendants' operation of a platform policy enforcement system that permanently disabled Plaintiff's Meta for Business and Facebook accounts under the Child Sexual Exploitation (CSE) policy while restoring similarly situated white users violated 42 U.S.C. §§ 1981 and 1982.

180.  DECLARE that the Vendor Defendants, while performing Meta's platform-policy enforcement services under contract with Meta, participated in discriminatory enforcement by affirming Plaintiff's false CSE invocation while viewing users' race-identifying materials.

181.  DECLARE that no NCMEC CyberTipline report was filed regarding Plaintiff's July 4, 2022 CSE enforcement action by Meta Platforms, Inc. or any Vendor Defendant, and that the Meta–vendor enforcement workflow did not result in any such report.

182.  DECLARE that Plaintiff owns his account-resident business property and that Defendants' withholding of such property while maintaining disparate restoration practices violates 42 U.S.C. § 1982.

## III. PUBLIC INJUNCTIVE RELIEF

## Orders Against Meta Platforms, Inc.:

183.  *Public Transparency Dashboard:* Within 120 days, Meta must establish and maintain a publicly accessible dashboard, updated at least

quarterly, reporting the following metrics for every enforcement policy category under which Meta permanently disables account access or functionality:

  a. Total enforcement actions by category and platform

  b. Total permanent account disablements by category

  c. Total requests for review received and percentage restored by category

  d. Percentage of human reviews where user-identifying information (profile photos, government IDs, or other identity-revealing materials) was visible to reviewers at decision point

  e. For any category with statutory reporting obligations, the ratio of enforcements to statutory reports filed

The dashboard must:

  f. Display all existing enforcement categories without exception

  g. Include any new categories within 30 days of implementation

  h. Maintain a rolling five-year historical view

  i. Provide downloadable raw data in machine-readable format

  j. Include methodology documentation explaining data collection and categorization

  184. *CyberTipline Status Portal:* Establish within 120 days a user-accessible portal where any U.S. user with prior account-administration rights over a disabled account (including individuals administering personal accounts, Page owners, and business account administrators) may request and receive within 30 days:

a. Whether a NCMEC report was filed regarding their account (yes/no)

b. The date of any such filing

185. *Data Export for Permanently Disabled Accounts:* For any account permanently disabled, Meta must provide the individual who held prior account administration rights (including business owners, Page owners, and professional accounts) upon request within 14 days, a machine-readable export of account-resident data the user created or received.

Exceptions to export include:

a. Communications made by persons over the age of 18 with accounts administered by users under the age of 18

b. Content depicting, describing, or relating to minors

c. Content forming the basis of reports to NCMEC, law enforcement, or child-safety organizations

d. Content under active law enforcement preservation

For excepted content, Meta must provide a log detailing quantity and categories of withheld materials.

186. *Arbitration Window Status Disclosure:* For any account termination where the user was subject to any agreement containing arbitration provisions, Meta must include in the termination notice:

a. Whether any such agreement had been triggered and, if so, the triggering event and date

b. Whether the termination occurred within any applicable arbitration opt-out period

c. The number of days remaining in any opt-out period at the time of termination

187. *Enhanced Transparency Reporting for CSE Enforcement:* Meta must expand the publicly posted transparency reports to include, for child sexual exploitation enforcement, retroactive to January 1, 2020 and continuing quarterly:

a. Account-level enforcement actions disaggregated by race, age bracket, and gender

b. NCMEC CyberTipline reports filed, disaggregated by race

c. Comparison rates between enforcement actions and CyberTipline reports, and between permanent disablements and CyberTipline reports, by race

Reporting must consist of aggregate, de-identified data only. No CyberTipline contents or user identifiers shall be disclosed. Each report must include a methods appendix explaining data collection and analysis. Meta must update these reports quarterly with a historical backfill to January 1, 2020.

188. *Identity-Neutral Review for Safety Enforcement:* For safety enforcement including CSE, Meta must implement masking of identity-revealing imagery—including profile photos, avatars, and government identification—by

default at every human review stage unless identity verification constitutes the specific task at that step.

A reviewer who has viewed unmasked identity information in any non-identity-verification step cannot serve as the final decision-maker for that account.

189. *Remedial Notice to CSE-Disabled Account Holders:* Within 120 days, Meta must send a neutral, factual notice to each user with prior account-administration rights over any account permanently disabled under the CSE policy from January 1, 2020 to present. Thereafter, Meta must send such notice within 14 days of any new CSE permanent disablement.

The notice must include:

a. Clarification that the CSE enforcement constitutes a platform policy determination rather than a legal finding or criminal accusation

b. Disclosure of whether a CyberTipline report was filed for the account and, if filed, the date of filing

c. Instructions for requesting a machine-readable export of non-excepted account data and obtaining a manifest of withheld content

d. Reference to Meta's enhanced transparency reporting and methodology documentation

190. *Audit Log Retention:* Meta must maintain for five years audit logs sufficient to show for any human review:

a. Timestamp of review

b. Reviewer role designation

c. Whether identity-revealing imagery was displayed

d. Written rationale if masking was lifted

The logs shall also retain, at a minimum, the Enforcement Event ID, Review Session ID, Decision-Mode field value (automated-only vs. human-involved), and any Reviewer Role Identifier and Vendor Identifier fields that distinguish Meta employees from vendor personnel.

191.    *Bias-Mitigation Training and Public Reporting:* Meta must conduct annual training for reviewers and supervisors on avoiding reliance on protected characteristics. Meta must publish annual public summaries including:

a. Training completion rates

b. Curriculum overview

c. Exception-use rate trends

Individual employee information shall not be disclosed.

192.    *Aggregate Disparity Analysis:* Twice yearly for five years from judgment, Meta must publish aggregate summaries of:

a. Enforcement outcomes including review affirmations versus restorations

b. Exception-use rates for identity masking

c. Disparities by protected class using existing data and lawful proxies

No party shall be required to collect new sensitive data solely for compliance. Each report must include methodology notes.

### Orders Against Vendor Defendants (Accenture LLP, Genpact Limited, and TaskUs, Inc.):

193. *Final Review Transparency Statement:* Within 60 days, each Vendor Defendant must publish on its website a statement describing: (a) its role in Meta's final human review for policy enforcement during 2020-2025; (b) whether reviewers could view users' profile photos and government identification images during review; (c) bias-mitigation training in place during that period.

194. *Quarterly Metrics:* Publish quarterly: (a) total final reviews performed for Meta in safety policy enforcement categories; (b) percentage of final reviews in which identity-revealing imagery was displayed; (c) comparative affirmation rates when such imagery was visible versus masked.

195. *Implementation of Identity-Neutral Review Protocols:* When performing final review or other human review services for Meta's safety enforcement, each Vendor Defendant must implement: (a) masking of identity-revealing imagery by default; (b) separation of identity-verification and decision-making functions; (c) two-key exception system for unmasking; (d) logging and five-year retention of exception use. Each Vendor Defendant must bind partners and subcontractors performing substantially similar functions to these requirements through contractual obligations.

196. *Reviewer Training and Aggregate Reporting:* Each Vendor Defendant must conduct annual bias-mitigation training for reviewers and supervisors and publish annual public summaries showing training completion rates and exception-use rate trends.

48

197.  *Vendor Accountability Disclosure:* Each Vendor Defendant must disclose annually the number of Meta account holders who contacted it directly seeking review or explanation of permanent exclusion decisions, and the number of such requests referred back to Meta without independent review.

### IV. ADDITIONAL RELIEF

198.  Such other and further relief as the Court deems just and proper.

### V. JURY TRIAL DEMANDED

199.  Plaintiff demands a jury trial on all issues so triable.

Dated: March 4, 2026                                    Respectfully submitted,

Marvelle J. Ballentine
Plaintiff, *pro se*
7862 W. Irlo Bronson Memorial Hwy
#82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com

49