UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARVELLE J. "JAY"
BALLENTINE,

        Plaintiff,                  Civil Action No. 6:26-cv-00376

      v.                          Judge Anne-Leigh Gaylord Moe

META PLATFORMS, INC.;
ACCENTURE LLP; TASKUS, INC;
and GENPACT USA, INC.

        Defendants.         /

## DEFENDANT ACCENTURE LLP'S
## MOTION TO DISMISS PLAINTIFF'S CLAIMS

Defendant Accenture LLP moves to dismiss all claims asserted in plaintiff Marvelle J. "Jay" Ballentine's amended complaint against it with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) because plaintiff has not stated and cannot state a claim against Accenture LLP upon which relief can be granted.

### INTRODUCTION[1]

Plaintiff Ballentine has not pleaded valid claims. According to the amended complaint, defendant Meta Platforms, Inc. terminated Ballentine's Facebook advertising account after flagging it for child sexual exploitation ("CSE") material. The amended complaint also alleges that one of three third-party service vendors—

---

[1] All citations are cleaned up with emphasis added, unless otherwise noted.

Accenture LLP, TaskUs, Inc., or Genpact Ltd.—assisted in reviewing Ballentine's account nearly four years ago.  Ballentine theorizes that his Facebook account was terminated because of his race.  But even taking Ballentine's pro se status into account, the amended complaint simply does not supply the many necessary allegations to turn an adverse action on a Facebook account into a far-fetched conspiracy among four businesses to discriminate against Black entrepreneurs.  Ballentine's claims should be dismissed.

First and foremost, Ballentine has not plausibly alleged facts to show that Accenture—an entity he acknowledges had no technical ability to terminate his account—caused his injuries.  Nor has Ballentine alleged facts that show that Accenture acted with racial animus, as each of his claims requires.  Instead, the amended complaint piles speculative inference upon speculative inference:  a vendor *may* have been able to see Ballentine's race during the review process; that vendor *may* have been Accenture; and therefore Accenture *must* have recommended a ban based on race.  But he offers no allegations to support that speculative leap.  Nothing in the amended complaint either directly or indirectly supports the entirely false allegation that Accenture acted because of Ballentine's race, much less that it did so as a government actor.  Indeed, across the eight complaints that Ballentine has filed relating to these claims, he has never actually alleged anything about the content he allegedly posted and that he claims was improperly removed.

Moreover, the Communications Decency Act ("CDA") shields Accenture from liability for its content moderation.  Because Section 230(c)(1) of the CDA bars claims

against interactive computer service providers based on the removal of content (including accounts) from their services, it follows that third-party content-moderation service providers are also immune from liability for assisting with those publication decisions.   Similarly, Section 230(c)(2) of the CDA protects content moderators' voluntary and good-faith efforts to keep the internet safe, including by assisting others in eliminating objectionable material on their websites.

Ballentine's latest attempt to embark on a fishing expedition to try to find facts that support his unfounded theory of invidious racial discrimination should be rejected.  Ballentine already once voluntarily withdrew his complaint against Meta and Accenture in the Northern District of California after the briefing on defendants' motions to dismiss concluded.  But four days later, he filed this nearly identical case in a new jurisdiction.  And remarkably, Ballentine has now filed separate lawsuits against Accenture, its counsel, and others in which he claims that Accenture's counsel's accurate recitation of his complaint in a federal court pleading constitutes defamation—a proposition that even a simple search would refute.  The Court should dismiss Ballentine's amended complaint.

## BACKGROUND[2]

Meta Platforms, Inc. operates social-media platforms like Facebook and Instagram that enable millions of users worldwide to connect, communicate, and advertise online.  *See* ECF No. 19 ("FAC") ¶ 30.  As the host of a wide range of user

---

[2]  Accenture accepts as true the factual allegations in the amended complaint solely for the purposes of this motion to dismiss; it does not otherwise concede the truth of any of those allegations.

content across its platforms, Meta takes significant steps to ensure a safe experience for users: it establishes community and advertising standards, *see id.* ¶ 60, reviews user content for violations of those standards, *id.* ¶ 34, and retains authority to suspend or ban accounts that do not follow its standards, *id.* ¶ 33. Relevant here, Meta also actively screens for materials that violate its policy against CSE. *Id.* ¶ 34.

Accenture LLP, TaskUs, Inc., and Genpact Ltd. assist Meta in its content-moderation efforts, including by reviewing appeals from users whose material has been flagged under Meta's CSE policy. *Id.* ¶ 42. Meta flags potential violations and sets the rules for review, *id.*, and vendor teams perform a human review of the Meta-flagged content under Meta's policies and training, *id.* ¶¶ 108–10. When Meta identifies an "apparent" violation of child exploitation laws, it is required by law to report the violation to the National Center for Missing and Exploited Children (NCMEC) for further investigation. *Id.* ¶ 74. As the platform operator, Meta retains full control over the NCMEC reporting process, *see id.*, reserves "override authority" over vendors' enforcement recommendations, *id.* ¶ 33, and "ratifie[s]" the outcome of vendors' review, *id.* ¶ 124.

Plaintiff Marvelle J. "Jay" Ballentine promoted and sourced work for his RV-repair-services business using a Facebook advertising account beginning in June 2022. *Id.* ¶ 53. He also used his account to access continuing-education materials through the National RV Training Academy's Alumni Facebook Group. *Id.* ¶ 52. Plaintiff is a Black man. *Id.* ¶ 18.

On July 4, 2022, Meta flagged Ballentine's account for a violation of its CSE policy and disabled the account. *Id.* ¶¶ 54, 56. Ballentine appealed, and Meta requested identity verification before processing the appeal. *Id.* ¶ 54. Ballentine submitted his passport. *Id.* On Meta's request, a human moderator at either Accenture, TaskUs, or Genpact reviewed Ballentine's account. *Id.* ¶ 7. After the review, Meta terminated Ballentine's account. *Id.* ¶ 56. Ballentine claims he lost out on pending RV service requests, access to educational materials, and the ability to acquire customers after his account was terminated. *Id.* ¶¶ 63–65.

On September 9, 2025, Ballentine filed a complaint against Meta and Accenture in the United States District Court for the Northern District of California in which he claimed that his Facebook account was terminated because of his race and not because of a CSE violation. *See* ECF No. 4 at 6.[3] Meta and Accenture moved to dismiss Ballentine's complaint for failure to state a claim upon which relief could be granted. *Id.* at 9. Ballentine amended his complaint the following day. *Id.* Meta and Accenture then moved to dismiss Ballentine's amended complaint. *Id.* at 10. None of Ballentine's submissions has ever provided details about the content he attempted to post on Facebook before Meta terminated his account.

Approximately one week before the hearing on defendants' motions to dismiss, Ballentine moved to transfer the action from the Northern District of California to this

---

[3] Accenture does not oppose Ballentine's motion to take judicial notice of the public docket in his previous action in the Northern District of California. ECF No. 4. It opposes as improper his motion to take judicial notice of his personal summary of those proceedings. *Id.*

Court. *Id.* at 59. Before any party could respond to Ballentine's transfer motion, Ballentine voluntarily dismissed his action and refiled a new complaint in this Court. *Id.* at 63.

Ballentine's new complaint added two other "vendor defendants"—TaskUs and Genpact. It explained that Ballentine does not know which vendor defendant reviewed his account, but that one of them did. ECF No. 1, at ¶ 47. The initial complaint also asserted four new state-law claims against Accenture: tortious interference with business relationships, intentional infliction of emotional distress, civil rights conspiracy, and a violation of Florida's Deceptive and Unfair Trade Practices Act. *Id.* ¶¶ 210, 222, 227, 233. Ballentine sought declaratory relief, public injunctive relief, attorney's fees, and monetary damages "in an amount exceeding $250,000,000." *Id.* ¶ 250A–E.

Ballentine amended his complaint to drop the state claims, *see* FAC ¶ 1, which he has since refiled in state court along with various other claims against a total of seven defendants, ECF No. 22. He also separately sued Meta and Accenture's counsel in this Court and in state court for defamation, civil conspiracy to defame, and intentional infliction of emotional distress based on a legal argument in Accenture's motion to dismiss Ballentine's previous complaint in the Northern District of California. *See* ECF Nos. 3, 22. Ballentine has now filed eight complaints related to his claims.

Ballentine brings four federal claims against Accenture in this action: violations of 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3). FAC ¶¶ 138, 150, 160, 169. He now

seeks declaratory relief, public injunctive relief, and monetary damages "in an amount not less than $500,000,000." *Id.* ¶ 178.

## LEGAL STANDARD

A motion to dismiss should be granted if the complaint fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Pleadings that are "no more than conclusions[] are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## ARGUMENT

Ballentine's claims against Accenture fail as a matter of law. First and foremost, the amended complaint does not sufficiently allege that Accenture either caused Ballentine's alleged injuries or discriminated against him because of his race. Ballentine's claims are also separately barred by Section 230 of the CDA because they seek to hold Accenture liable for Meta's protected publication decisions as well as Accenture's good-faith efforts to filter objectionable material. And Ballentine's Section 1983 and 1985(3) claims fail for additional, independent reasons: the amended complaint does not plausibly suggest that Accenture is a state actor, nor does it plausibly suggest that Meta's termination of Ballentine's account was in fact part of a multi-level conspiracy to discriminate against Ballentine. The Court should dismiss Ballentine's claims against Accenture with prejudice.

I.    **Ballentine's Claims Fail Because His Allegations Do Not Establish That Accenture Caused His Injuries or Acted Out of Racial Animus**

Ballentine's claims fail because they are not supported by sufficient allegations to support the claims.  First, the allegations in the amended complaint do not establish that, but for Accenture's alleged actions, Ballentine would not have suffered his alleged injuries.  And second, Ballentine's allegations do not support his conclusion that Accenture acted with racial animus.

A.    **The Amended Complaint Does Not Sufficiently Allege That Accenture Caused Ballentine's Injuries**

Nothing in Ballentine's amended complaint plausibly suggests that Accenture caused his alleged injuries.  "It is 'textbook tort law' that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 331 (2020).  This means the plaintiff must "show that the harm would not have occurred in the absence of . . . the defendant's conduct."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013).  The "but for" causation test "supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action," including antidiscrimination laws like those at issue here.  *Comcast*, 589 U.S. at 332.  And because "the essential elements of a claim remain constant through the life of a lawsuit," this requirement applies equally at the motion-to-dismiss stage: a plaintiff must "plausibly allege" but-for causation for each defendant.  *Id.*

Ballentine's amended complaint does not meet this standard.  To start, it improperly "assert[s] multiple claims against multiple [vendor] defendants without

8

specifying which of the [vendor] defendants are responsible for which acts or omissions." *Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021). Although it specifies that "the claim is brought against" all vendor defendants, *id.*, it does not clearly indicate whether *all three* vendor defendants reviewed the account, or whether it is merely guessing that *one* of the three vendors must have reviewed the account. *Compare* FAC ¶ 171 (asserting that all three "Vendor Defendants joined and acted in furtherance" of a conspiracy to terminate Ballentine's account), *with id.* ¶ 175 (asserting that a single "Vendor Defendant" reviewed Ballentine's account). That alone warrants dismissal. *See Lyles v. Sch. Dist. of Osceola Cnty.*, 2023 WL 8437717, at *1 (M.D. Fla. Feb. 2, 2023) (dismissing shotgun pleading).

Even if the amended complaint properly attributed conduct to a specific vendor defendant (or plausibly pleaded alternative causation), it still would fail to state a claim. The amended complaint makes numerous allegations that cut *against* the inference that any vendor defendant—let alone Accenture specifically—caused Ballentine's injuries. For one, it affirmatively alleges that Meta controlled the content moderation for the Facebook service at issue. According to the amended complaint, Meta set content policies for its "enforcement pipeline," FAC ¶ 42; made initial CSE designations, *see id.*; "directly trained Accenture reviewer teams" and "provid[ed] instruction on Meta's policies and review procedures," *id.* ¶ 107; submitted official CSE reports, *id.* ¶ 38; retained "override authority" over and "ratified the final outcome" of any vendor recommendation before actioning an account, *id.* ¶¶ 42, 142;

and held exclusive power to approve, restrict, terminate, or reinstate accounts, and to return any lost data, *see id.* ¶¶ 53–57.

Accenture, meanwhile, operated in a more limited sphere consistent with its role as a third-party service provider.  The amended complaint asserts that, if Accenture reviewed Ballentine's account at all, it relied on "Meta-provided account-review tools," *id.* ¶ 110; acted "within Meta's enforcement framework," *id.*; made "client guided" recommendations, *id.* ¶ 114; and was subject to Meta's unilateral "override authority" in doing so, *id.* ¶ 33.

Given these affirmative allegations, Accenture cannot be the but-for cause of Ballentine's alleged injuries.  Indeed, by the amended complaint's own terms, Ballentine's account was flagged for CSE *before Accenture was ever involved* in the review process.  *Id.* ¶ 54.  When Accenture (or another vendor defendant) later reviewed the alleged violation, it acted according to extrinsic training, policies, and procedures.  *Id.* ¶ 110.  And when Accenture completed its review, the most it could do was issue a recommendation for action; as Ballentine acknowledges, Accenture lacked authority to disable his account.  *See id.* ¶¶ 42, 142.

The amended complaint's "naked assertion" that Accenture caused Ballentine's injuries is thus not only "devoid of [ ] factual enhancement," *Iqbal*, 556 U.S. at 678— it *directly contradicts* the very allegations on which it relies.  Because Ballentine's amended complaint fails to plead—and affirmatively eliminates—the "essential element[]" of but-for causation against Accenture, *Comcast*, 589 U.S. at 332, the Court

cannot "draw the reasonable inference that [Accenture] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Ballentine's claims should be dismissed.

### B.     The Amended Complaint Does Not Sufficiently Allege That Accenture's Actions Were Based on Racial Animus

Ballentine's claims also fail for the independent reason that the allegations in the amended complaint do not plausibly support an inference of racial animus or discriminatory intent.  In *Comcast*, the Supreme Court held that a Section 1981 plaintiff must plead and prove that racial animus is not just *one* of the reasons behind the defendant's actions, but *the* reason for those actions.  *See* 589 U.S. at 333.  Similarly, because Section 1982 "uses nearly identical language" to Section 1981, *id.* at 336, courts have extended *Comcast*'s but-for requirement to Section 1982 claims.  *See, e.g.*, *Christian v. Rancho Grande Manufactured Home Cmty.*, 2024 WL 3372687, at *1 (9th Cir. July 11, 2024), *cert denied*, 145 S. Ct. 1057 (2025); *James v. City of Evanston*, 2021 WL 4459508, at *9 (N.D. Ill. Sept. 29, 2021).  Claims brought under Sections 1983 and 1985(3) also require a showing of discriminatory intent or animus.  *See Washington v. Davis*, 426 U.S. 229, 239–40 (1976) (claims based on equal protection[4]); *Chua v. Ekonomou*, 1 F.4th 948, 955 (11th Cir. 2021) (Section 1985(3) claims).

Ballentine's amended complaint does not meet this threshold requirement.  According to the amended complaint, one of the vendor defendants "had access to account-level identifiers, including profile photos, names, and in some cases

---

[4]     Although Ballentine's "alternative" Section 1983 claim that the defendants violated his procedural due process rights does not require allegations plausibly suggesting racial animus, that claim fails because Accenture is not a state actor.  FAC ¶ 160; *infra* Part III.A.

government-issued ID images, sufficient to reveal a user's race" during the review process. FAC ¶ 44. The amended complaint also alleges Accenture was aware that "automated models can be 'wrong' more often for some groups." *Id.* ¶ 46. And it asserts that Meta permanently terminated Ballentine's account "[w]ithin hours of receiving [his] identification." *Id.* ¶ 56. Based on these allegations, the amended complaint hypothesizes that Accenture (or another vendor defendant) had Ballentine's identification "visible on-screen," saw the color of his skin, and recommended that Meta affirm his ban because he is Black. *Id.* ¶ 154.

From start to finish, Ballentine's series of speculative inferences lacks the requisite support to state a claim as a matter of law. To begin, the amended complaint makes clear that Ballentine does not know whether Accenture's reviewers even had *access* to his photograph. *See, e.g.*, *id.* ¶ 193 (requesting relief from the vendor defendants in the form of an online publication explaining "*[w]hether* reviewers could view users' profile photos and government identification images during review"); *id.* ¶ 190 (requesting relief from Meta in the form of an "audit log" explaining "[w]hether identity-revealing imagery was displayed" during "human review" of accounts). Ballentine's personal belief that Accenture's reviewers *may* have seen his race during the review process cannot support his conclusion that they *must* have recommended a ban based on race. *See Twombly*, 550 U.S. at 570 (explaining that naked speculation cannot "nudge[] [a plaintiff's] claims across the line from conceivable to plausible"). Many courts within the Eleventh Circuit have dismissed discrimination claims for similar deficiencies, and this Court should do the same. *See, e.g.*, *Jackson v. BellSouth*

*Telecomms.*, 372 F.3d 1250, 1274 (11th Cir. 2004); *Lang v. SPM Prop. Mgmt.*, 2020 WL 13695197, at *16 (S.D. Ala. Feb. 27, 2020); *Potwin v. Dynasty Bldg. Sols., LLC*, 2024 WL 4881385, at *2–3 (M.D. Fla. Nov. 25, 2024).

Even assuming Accenture's reviewers had access to Ballentine's photograph, the amended complaint does not plausibly allege that race was a factor in their review. Generally, a plaintiff may raise an inference of discrimination by identifying and describing "comparators of a different race who were 'similarly situated in all material respects' and were not subject to the same mistreatment." *Horton v. Beacon Woods East*, 2025 WL 3089014, at *6 (M.D. Fla. Nov. 5, 2025). But "[w]hen the plaintiff takes this route . . . [he] must plead sufficient detail about the proposed comparator so that the court can reasonably infer that racial animus accounts for the difference in treatment." *Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d 1155, 1163 (W.D. Wash. May 16, 2016) (collecting cases); *Lang*, 2020 WL 13695197, at *15.

Ballentine does not begin to satisfy this standard. Although he references a handful of white "comparators" whom he believes were treated differently, not one of those comparators is similarly situated to Ballentine "in all material respects." *Horton*, 2025 WL 3089014, at *6. First, three of Ballentine's five comparators allegedly had their accounts flagged for violations *entirely unrelated* to CSE. FAC at 17-18 (table of comparators alleging that white users who posted "artistic" nudity, "[a]dult [n]udity/[s]olicitation," and "[h]uman [e]xploitation" materials later had their accounts reinstated). And though another comparator's account was flagged for a violation of Meta's CSE policy, it was later determined to contain "a medical C-section

13

video." *Id.* That four white individuals with what appear to be entirely different account types had their accounts flagged and restored under entirely different circumstances does not plausibly raise any inference that Accenture engaged in invidious racial discrimination against Ballentine.

That leaves Ballentine with a single, unnamed comparator—"COMP-1"—whom he alleges he discovered through a single post from an unnamed author on the social-media platform X. *Id.* ¶ 71. But even that mysterious comparator cannot advance Ballentine's assertion of racial animus. The amended complaint itself offers *no* details—none—about the post or posts that allegedly led to Meta's termination of Ballentine's account. Ballentine's failure to describe the content of *his own advertisements*—even when pressed by Accenture in the parties' previous briefing and across eight complaints that he has now filed in three different courts—makes any meaningful comparison impossible. And the amended complaint's description of COMP-1 is similarly vague: it does not give any specific details about COMP-1's flagged content. Without *any* information about each party's specific posts, Ballentine's amended complaint does not plausibly state a claim that any alleged disparate treatment was based on race and not on content. *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1352–54 (N.D. Ga. 2017) (dismissing Section 1981 discrimination claim where the plaintiff "fail[ed] to identify or describe the comparators in enough detail to show that [she] and the employees [were] similarly situated in all relevant respects or that they [were] nearly identical"); *Pillitieri v. City of Flagler Beach*, 2017 WL 3840433, at *4 (M.D. Fla. Sept. 1, 2017) ("Where a plaintiff

has not demonstrated that a comparator was similarly situated in all relevant respects, dismissal is appropriate."); *Scribner v. Collier County*, 2011 WL 2746813, at *4 (M.D. Fla. Jul. 14, 2011) (similar); *Halstrbrison, LLC v. Se. Overtown/Park W. Cmty. Redevelopment Agency*, 2024 WL 5493421, at *3 (S.D. Fla. Mar. 27, 2025) (similar).

Finally, even assuming Accenture's reviewers (1) could access users' photographs, (2) were assigned Ballentine's case, (3) recommended that Meta affirm his ban in the absence of a CSE violation, the amended complaint does not plausibly suggest Ballentine is entitled to relief. In making the plausibility determination, "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022) (affirming dismissal of Title IX discrimination claim).

Here, the amended complaint does not eliminate all alternative, non-discriminatory explanations for Accenture's alleged recommendation. For example, although Ballentine alleges there was no CSE violation associated with his account, *id.* ¶ 8, the amended complaint does not allege that Ballentine's account complied with all of Meta's community standards. *See, e.g.*, FAC ¶ 8 (alleging only that "no violation existed *to report [to NCMEC]*"). Ballentine does not describe Meta's community standards. Nor does he detail the content of his own account. *Supra* p. 14. Without more, the Court can infer from the amended complaint that Ballentine's account was

terminated for non-discriminatory reasons,[5] and the amended complaint does not "plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 681.

Ballentine's claims require establishing that Accenture acted with racial animus. The amended complaint impermissibly piles speculative inference upon speculative inference: Ballentine's account *may* have complied with Meta's community standards; a vendor *may* have been able to see Ballentine's race during the review process; that vendor *may* have been Accenture; and therefore Accenture *must* have recommended a ban based on race. But because the allegations in the amended complaint do not support this speculative leap, they cannot "nudge[] [Ballentine's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Ballentine's claims are "precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told [courts] to ignore when evaluating a complaint's sufficiency." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013). Ballentine's claims should be dismissed.

---

[5]    Remarkably, Ballentine has filed two lawsuits against Accenture, its counsel, and others for defamation and IIED based on this legal argument. ECF No. 3 (notice of related action in federal court); ECF No. 22 (notice of related action in state court). Ballentine then refused to engage with Accenture's counsel in the Northern District of California on the basis that he had filed a lawsuit against them. Ballentine's lawsuit is obviously baseless. *Jackson*, 372 F.3d at 1274 ("Florida's litigation privilege affords absolute immunity for acts occurring during the course of judicial proceedings."). Indeed, there are numerous cases in which parties have raised (and courts have accepted) the "obvious alternative explanation" defense. *See, e.g.*, *Iqbal*, 556 U.S. at 682; *Henley*, 267 F. Supp. 3d at 1353–54 (collecting cases). Ballentine's additional lawsuits only underscore the lack of merit to his claims.

16

## II.    The Communications Decency Act Bars Ballentine's Claims

Ballentine's claims should be dismissed for another independent reason: both section 230(c)(1) and section 230(c)(2) of the CDA shield Accenture from liability for its content-moderation efforts.  47 U.S.C. §§ 230(c)(1), (2).  Section 230(c)(1) provides protection to any "provider or user of an interactive computer service" that is treated as the "publisher" of third-party content.  47 U.S.C. § 230(c)(1); *Roca Labs, Inc. v. Consumer Op. Corp.*, 140 F. Supp. 3d 1311, 1319 (M.D. Fla. 2015) ("Lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional functions—such as deciding whether to publish, withdraw, postpone, or alter content—are barred.").  And Section 230(c)(2) provides protection to any "provider or user of an interactive computer service" for good-faith actions "to restrict access to . . . material that the provider or user considers to be . . . objectionable."  47 U.S.C. § 230(c)(2).  Accenture's content-moderation efforts fall squarely within these immunity-granting provisions.

To begin, whether as a "user" of an "interactive computer service" or a third-party service to a "provider" of an "interactive computer service," Accenture qualifies for CDA protection.  Accenture is clearly a "user" of an interactive computer service—Meta and its content-moderation services—because Accenture necessarily accesses Meta-housed content and uses Meta-developed tools to assist Meta with content moderation.[6]  *See* FAC ¶ 110.  Although the CDA does not define or give examples of

---

[6]    The Eleventh Circuit has acknowledged that "website exchange systems and online message boards are interactive computer services." *See, e.g.*, *McCall v. Zotos*, 2023 WL 3946827, at *2 (11th

who qualifies as a "user," courts have held that CDA immunity encompasses traditional account holders and content moderators alike. *See, e.g.*, *E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 307 F. Supp. 3d 952, 965 (D. Minn. 2018), *aff'd*, 971 F.3d 747 (8th Cir. 2020) ("Moderator of third-party content" was entitled to CDA immunity against defamation claims under Section 230(c)(1)). This reading aligns with common sense: a "user" under the CDA is simply someone who uses an interactive computer service. *See User*, Webster's Ninth New Collegiate Dictionary (1990) (defining "user" in the years leading up to the passing of the CDA as "one that uses").

Accenture is also entitled to protection in its content-moderation role through Meta's status as a "provider." Because the CDA shields from liability those who, like Meta, provide "software . . . or enabling tools that . . . filter, screen, allow, or disallow content," 47 U.S.C. § 230(f)(4), it follows that content-moderation services like Accenture—whose contractual purpose is to assist Meta in its efforts to filter and screen Meta's content, *see* FAC ¶ 100—are also immune from liability for those actions.

Under Section 230(c)(1), Accenture cannot be held liable for recommending that Meta remove Ballentine's account. Indeed, "[a]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is

---

Cir. June 12, 2023). Other circuits have held more specifically that Meta's social-media platforms, including Facebook, are interactive service providers. *See, e.g.*, *Sikhs for Just., Inc. v. Facebook, Inc.*, 697 F. App'x 526, 526 (9th Cir. 2017).

perforce immune under Section 230." *Mezey v. Twitter, Inc.*, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018).  Courts have consistently dismissed claims where, as here, those claims are based on a defendant's decision to suspend or terminate a user's account.[7]  *See, e.g.*, *id.*; *Elansari v. Meta, Inc.*, 2024 WL 163080, at *2 (3d Cir. Jan. 16, 2024); *King v. Facebook, Inc.*, 572 F. Supp. 3d 776, 795 (N.D. Cal. 2021).

Similarly, under Section 230(c)(2), Accenture cannot be held liable for its "voluntar[y]" and "good faith" actions to recommend removing content Meta deems objectionable.  47 U.S.C. § 230(c)(2)(A).  As explained, Ballentine has not sufficiently alleged that Accenture acted in bad faith.  Indeed, Ballentine does not (and cannot) say "[w]hether [Accenture's] reviewers could [even] view users'" identification during the review process.  FAC ¶ 193.  Ballentine's belief that Accenture's reviewers *may* have been able to see his race during the review process does not support his conclusion that they *must* have acted in bad faith.  *See Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1105 (N.D. Cal. 2011) (dismissing claim under Section 230(c)(2) where plaintiff's conclusory allegations did not adequately plead "an absence of good faith"); *see also e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008)

---

[7]  As explained above, the amended complaint does not adequately allege that Accenture caused Ballentine's alleged injuries.  *See supra* Part I.A.  But even if it did, Ballentine has pleaded himself right into the CDA by asserting that Accenture played a role in Meta's publication decision.  As Florida courts have acknowledged in other contexts, "every one who takes part in the publication . . . is charged with publication."  *Doe v. Am. Online, Inc.*, 783 So.2d 1010, 1017 (Fla. 2001); *see generally Doe on Behalf of Doe v. Grindr, LLC*, 2023 WL 7053471, at *2 (M.D. Fla. Oct. 26, 2023) (holding that a defendant is treated as a publisher when a plaintiff's claim is "inextricably linked" to a publication decision).  Ballentine's amended complaint is therefore at odds with itself: either Accenture's alleged review did not cause Ballentine's injuries, or Accenture assisted with a protected editorial decision.  Either way, Ballentine's claims fail.

(same).  Accenture acted in accordance with Meta's content policies throughout the review process, FAC ¶ 110, and ultimately concluded Ballentine's content was "objectionable" under those policies, 47 U.S.C. § 230(c)(2)(A).  The amended complaint does not allege otherwise, and Ballentine's claims against Accenture should be dismissed.  *See Republican Nat'l Comm. v. Google, Inc.*, 2023 WL 5487311, at *5–6 (E.D. Cal. Aug. 24, 2023) (dismissing claims of bad faith where factual allegations did "not rise above the speculative level").

Affording CDA protection to third-party content-moderation services is consistent with the congressional goal of "encourag[ing] service providers to self-regulate the dissemination of offensive material over their service."  *M.H. v. Omegle.com, LLC*, 2022 WL 93575, at *6 (M.D. Fla. Jan. 10, 2022), *aff'd sub nom. M.H. on behalf of C.H. v. Omegle.com LLC*, 122 F.4th 1266 (11th Cir. 2024).  To that end, this Court has explained that the CDA "establish[es] broad federal immunity."  *Roca Labs, Inc.*, 140 F. Supp. 3d at 1319.  This liberal construction allows "computer service providers to establish standards of decency without risking liability for doing so."  *Omegle.com*, 2022 WL 93575 at *6.  Accenture's moderation efforts are precisely the type of conduct the CDA protects.  And because this lawsuit seeks to hold Accenture liable for its role in blocking and screening online material, the CDA bars Ballentine's claims.

### III. Ballentine's Section 1983 and Section 1985(3) Claims Fail for Additional, Independent Reasons

Even beyond the factual and legal deficiencies described above, Ballentine's Section 1983 and Section 1985(3) claims cannot survive for additional, independent reasons: the amended complaint does not plausibly suggest that Accenture is a state actor or that Meta's termination of Ballentine's account was in fact part of a large-scale conspiracy to discriminate against Ballentine.

#### A. Accenture's Private Review of Ballentine's Account Is Not "State Action" Under Section 1983

Ballentine has not alleged facts to support his Section 1983 claim against Accenture, either through an alleged equal-protection or procedural-due-process violation. Regardless of the underlying constitutional argument, Section 1983 "only provides for claims to redress State action." *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001). A defendant's actions are attributable to the state only if (1) the alleged deprivation of rights was "caused by the exercise of some right or privilege created by the State," and (2) "the party charged with the deprivation . . . may fairly be said to be a state actor." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992).

Neither element is met here. First, Meta did not exercise a state-created right by enforcing its own private community standards though the termination of Ballentine's account. Accenture's review of Ballentine's account—performed (if at all) under Meta's privately set terms, FAC ¶ 107—therefore was also not an exercise of a state-created right. *See Sabeta v. Baptist Hosp. of Miami, Inc.*, 410 F. Supp. 2d 1224, 1244

(S.D. Fla. 2005) ("[T]he specific conduct attributed to [the defendant] arises not from any relationship with the government, but from its own alleged policies."). Second, Accenture is not a state actor. Indeed, Accenture is three times removed from any direct state conduct: according to the amended complaint, vendors make a recommendation to Meta (who retains override authority), FAC ¶¶ 33, 118; Meta reports any "apparent" CSE violations to NCMEC, *id.* ¶ 98; and NCMEC reports those violations to law enforcement, *id.* ¶ 75. This attenuated connection cannot support Ballentine's conclusion that vendors like Accenture are at the "chokepoint between platform enforcement and state investigation," *id.* ¶ 82, or that Accenture was "pervasively entwined with law-enforcement-facing functions such that the state is responsible for the decision," *id.* ¶ 162.

Further, even if the amended complaint alleged that Accenture personally had *any* interaction with law enforcement, courts have made clear in other contexts that mere compliance with reporting requirements is insufficient to transform a private actor into a state actor. *Lindbloom v. Manatee Mem'l Found., Inc.*, 2023 WL 11891890, at *3 (M.D. Fla. Apr. 13, 2023), *report and recommendation adopted*, 2023 WL 11891892 (M.D. Fla. Nov. 30, 2023) (holding that a hospital which acted in accordance with its statutory duty is not a state actor under Section 1983); *United States v. Williamson*, 2023 WL 4056324, at *14 (M.D. Fla. Feb. 10, 2023) ("[T]he mere fact that Yahoo has developed protocols to facilitate its interactions with the government" in relation to its duty to report child pornography does not render it a state actor); *United States v. Robinson*, 2025 WL 3039333, at *3 (M.D. Fla. Oct. 31, 2025) (noting in a parenthetical

that "a private actor does not become a government agent simply by complying with a mandatory reporting statute").  Ballentine's Section 1983 claim should therefore be dismissed.

### B. The Complaint Does Not Plausibly Allege a Conspiracy Between Meta and the Vendor Defendants

Ballentine's Section 1985(3) claim fails for the additional reason that the amended complaint does not plausibly allege a conspiracy between Meta and the vendor defendants.  Once again, the amended complaint has no factual support for this remarkable assertion.  It claims that, because the number of Meta's CSE enforcement actions exceeds the number of violations Meta reports to NCMEC, Meta must have engaged in discriminatory targeting against him.  And because the vendor defendants perform "staff[ed] human review within Meta's enforcement pipeline," they must have made an "agreement" with Meta to participate in that discrimination. FAC ¶ 171.

Ballentine's bare allegation of conspiracy is insufficient to state a claim. According to the amended complaint, Accenture employs nearly 6,000 reviewers dedicated exclusively to Meta's platforms, and the other vendor defendants employ thousands more.  FAC ¶¶ 21–23.  But "[f]or a conspiracy of the scale alleged by this complaint, one would expect at least some evidentiary facts to have been located and pled." *Kelsey K. v. NFL Enters.*, 254 F. Supp. 3d 1140, 1144 (N.D. Cal. 2017), *aff'd*, 757 F. App'x 524 (9th Cir. 2018).  This stringent standard is both intuitive and pragmatic: "it is only by taking care to require allegations that reach the level suggesting

23

conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence." *Twombly*, 550 U.S. at 559. Because such allegations are not present here, the Court should dismiss Ballentine's Section 1985(3) claim.

## CONCLUSION

The Court should dismiss with prejudice all claims against Accenture LLP.

Dated: March 18, 2026

Respectfully submitted,

*/s/ Marianna C. Chapleau*
*Marianna C. Chapleau*
*LEAD COUNSEL*
Florida Bar No. 1059142
KIRKLAND & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131
Telephone: 305 432-5687
Fax: 305 432-5601
mchapleau@kirkland.com

Devin S. Anderson (*pro hac vice forthcoming*)
KIRKLAND & ELLIS LLP
95 South State Street
Salt Lake City, UT 84111
Telephone: 801 877 8115
Fax: 801 877 8101
devin.anderson@kirkland.com

*Counsel for Defendant Accenture LLP*

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for Defendant Accenture LLP certifies that counsel conferred with Plaintiff via email, and Plaintiff opposes the relief requested in this motion.

*/s/ Marianna C. Chapleau*
Marianna C. Chapleau

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 18, 2026, I electronically filed the foregoing through Middle District of Florida's CM/ECF System, which will send a copy to all unrepresented parties and counsel of record.

/s/ *Marianna C. Chapleau*
Marianna C. Chapleau

27