# Exhibit 1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

MARVELLE J. BALLENTINE,

    *Plaintiff,*

    v.               Case No. 6:26-cv-00376-AGM-DCI

META PLATFORMS, INC.; ACCENTURE LLP;
GENPACT LIMITED; and TASKUS, INC.,

    *Defendants.*

### PLAINTIFF'S NOTICE OF DEPOSITION OF DEFENDANT

### ACCENTURE LLP

### PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff Marvelle J. Ballentine will take the deposition upon oral examination of Defendant Accenture LLP, by one or more officers, directors, managing agents, or other persons designated by Accenture LLP to testify on its behalf concerning the matters for examination set forth below. The deposition will be taken before a notary public or other officer authorized to administer oaths, will be recorded by stenographic and audiovisual means, and will continue from day to day until completed.

## DATE, TIME, LOCATION, AND METHOD

**Date:** Wednesday, April 29, 2026, commencing at 10:00 a.m. Eastern, and continuing on Thursday, April 30, 2026, commencing at 10:00 a.m. Eastern. Location: Kissimmee, Florida. The exact street address of the deposition location will be specified by supplemental notice served on counsel for Accenture LLP within three (3) days of the date of service of this notice.

**Method of recording:** Stenographic and audiovisual (videotape), pursuant to Federal Rule of Civil Procedure 30(b)(3)(A).

**Duration:** The deposition is noticed for two (2) days. The number of matters for examination, the breadth of subject matter, and the likelihood that Accenture LLP will designate more than one witness warrant a duration in excess of the seven-hour presumption of Rule 30(d)(1). Plaintiff invites Accenture LLP to stipulate to a deposition of up to fourteen (14) hours of testimony on the record over the two noticed days. Absent stipulation, Plaintiff will seek leave of Court.

## MATTERS FOR EXAMINATION

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Accenture LLP shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf concerning information known or reasonably available to Accenture LLP on each of the matters for examination set forth below.

The defined terms used in the matters for examination shall carry the meanings assigned to them in Plaintiff's Master Definitions and Instructions Governing Discovery, served concurrently herewith and incorporated by reference, including the identifier jaychizza@icloud.com defined as one of Plaintiff's Account Identifiers.

1.    **Accenture-Meta Engagement, Scope, and Authority.** The contractual relationship between Accenture LLP and Meta Platforms, Inc. governing Trust & Safety Services and Content Moderation Services during the period 2020 through 2022, including the existence and terms of Master Services Agreements, Statements of Work, and Change Orders; the scope of Accenture's contractual authority over CSE/CSAM Enforcement Queues and permanent account disablement workflows; the performance of Final Review by Accenture Personnel within Meta's enforcement framework; Meta's override authority over Final Review determinations; the use of Meta-provided systems and tools by Accenture Reviewers; the financial structure of the engagement, including hourly billing rates, reviewer compensation, and annual revenue from Meta content moderation services; the headcount of Accenture Personnel dedicated to Meta platform review queues; the locations of Accenture content moderation facilities serving Meta; and the participation of Facebook personnel in training Accenture Personnel at those facilities.

2.     **CSE Enforcement Architecture, Routing Determination, Override Authority, and Ratification.** Accenture Reviewers' capabilities, in July 2022, to close, affirm, deny, or escalate CSE-labeled enforcement actions in Meta's enforcement framework; Accenture Reviewers' performance of Final Review of CSE-labeled enforcement matters; the influence of Accenture Final Review outcomes on whether a CSE-labeled matter was routed to the CyberTipline Reporting Workflow or to a Non-Report Workflow; Accenture's role in executing or influencing the Routing Determination for CSE-labeled enforcement matters; Accenture's receipt or maintenance of standard operating procedures or decision trees governing the disposition of CSE-labeled matters; Accenture Reviewers' ability to select or influence whether a CSE-labeled matter was classified as reportable or non-reportable; QA Sampling of Accenture Final Review outcomes; Accenture's reporting of CSE enforcement metrics to Meta through governance reporting; Meta's ratification of Final Review determinations made by Accenture Personnel; the rate at which Meta exercised override authority to reverse Accenture Final Review determinations in Q3 2022; Meta's ratification of the Final Review determination for Plaintiff's Account in connection with the Account-Level Enforcement Event; and whether Meta exercised override authority to reverse any Final Review determination for Plaintiff's Account.

3.     **Systems of Record and Linkage Identifiers.** The existence, content, and structure of Review Session Telemetry, Tool Access Logs, and Queue Assignment Records maintained by Accenture LLP for Accenture Reviewers who

accessed Meta's enforcement tools; the data fields contained in Review Session Telemetry, including timestamps, reviewer identity, and disposition or action taken; the existence in Meta's enforcement systems of a Reviewer Role Identifier field, a Vendor Identifier field, and a Decision-Mode Field; the structured-export capability of the data referenced in this Matter; and Accenture's capability to retrieve or request from Meta logs sufficient to identify which Accenture Reviewers accessed Meta enforcement tools.

4.    **July 4, 2022 Event Linkage to Plaintiff's Account — Determinability, Records, Decision-Mode, Identification, Conditional Conduct, Temporal Sequence, and Preservation.** Whether Accenture maintains Review Session Telemetry, Tool Access Logs, Queue Assignment Records, and Audit Trail records sufficient to determine whether any Accenture Reviewer accessed materials associated with the account identifier jaychizza@icloud.com or with Plaintiff's Account in connection with the Account-Level Enforcement Event; whether Accenture maintains records sufficient to determine whether any Accenture Reviewer performed Final Review of Plaintiff's Account; whether, by correlating Review Session Telemetry, Tool Access Logs, Queue Assignment Records, and Meta-side Reviewer Role Identifiers, Accenture can determine reviewer identity for the Account-Level Enforcement Event; Accenture's ability or inability to determine whether any Accenture Reviewer accessed Plaintiff's account materials, performed Final Review of Plaintiff's Account, or to exclude Accenture Personnel as participants in the Final Review;

whether Accenture's records are sufficient to identify the reviewer category (Meta employee or Accenture Personnel) who made the Final Review determination; whether at least one Accenture Reviewer accessed Plaintiff's account materials or performed Final Review of Plaintiff's Account in connection with the Account-Level Enforcement Event; whether the Decision-Mode Field value for the Account-Level Enforcement Event reflects automated-only disposition or human-reviewer disposition; if human review occurred, the records sufficient to identify the reviewer; Accenture's ability to identify which vendor or Meta role performed the Final Review; Accenture's records' sufficiency to exclude or to fail to exclude Accenture Personnel as the Final Reviewer; the temporal sequence of the Final Review of Plaintiff's Account in relation to Meta's receipt of Plaintiff's Passport Image; the visibility of Plaintiff's Profile Photograph and Plaintiff's Passport Image in the Reviewer Interface before the Final Review determination; the affirmation of the enforcement outcome within twenty-four hours of receipt of the Passport Image and on the same calendar day Plaintiff submitted the Passport Image; the finality of the enforcement outcome; the processing of Plaintiff's Passport Image through the Identity Verification Workflow; the existence as of the date of response of Review Session Telemetry, Tool Access Logs, and Queue Assignment Records for July 2022; Accenture's Retention Schedule for Review Session Telemetry; the issuance and scope of any Litigation Hold concerning Plaintiff's July 4, 2022 enforcement event; and any deletion or overwrite of

Review Session Telemetry or Tool Access Logs for July 2022 prior to issuance of any Litigation Hold.

5. **CyberTipline Reporting and Reportability Status.** The influence of Accenture Final Review determinations on whether enforcement matters proceeded to the CyberTipline Reporting Workflow; Accenture's tracking and receipt of Reportability Status information for enforcement matters reviewed by Accenture Personnel; Accenture Reviewers' awareness, at or before Final Review, of whether an enforcement matter was classified as reportable or non-reportable; whether the Routing Determination for Plaintiff's case resulted in a Non-Report Workflow rather than the CyberTipline Reporting Workflow; whether any CyberTipline Report was Transmitted to NCMEC in connection with the Account-Level Enforcement Event; Accenture's awareness as of the Final Review date of the Reportability Status classification for Plaintiff's Account; Accenture's systems' or records' reflection of the Reportability Status determination for the Account-Level Enforcement Event; and Accenture Personnel's performance, in Q3 2022, of Final Review for CSE-labeled enforcement matters that were not routed to the CyberTipline Reporting Workflow and for which no CyberTipline Report was generated.

6. **Reviewer Interface, Identity Visibility, and Masking.** The configuration of the Reviewer Interface used by Accenture Reviewers for CSE enforcement in July 2022, including the reviewer's ability to view affiliated user-account information and government-issued identification submissions; Meta's

protocol in July 2022 for requesting and routing government-issued identification in connection with CSE enforcement matters; the default display of Identity-Revealing Imagery in the Reviewer Interface; the existence or non-existence of Masking as a feature in the Reviewer Interface in July 2022; whether Masking was enabled by default for Accenture Reviewers processing CSE enforcement; the ability of the same Accenture Reviewer who viewed Identity-Revealing Imagery to serve as decision-maker on the same enforcement matter; the existence or non-existence of Separation of Functions; the existence or non-existence of a Two-Key Exception System for accessing masked Identity-Revealing Imagery; whether the Reviewer Interface logs whether Identity-Revealing Imagery or government-issued identification was displayed during a review session; and whether Accenture's enforcement records for the Account-Level Enforcement Event are sufficient to determine whether any human reviewer was exposed to Identity-Revealing Imagery in connection with Plaintiff's Account.

7.     **SOP Development, Change Management, and Escalation.** Accenture's participation in developing, reviewing, approving, or implementing standard operating procedures, decision trees, and policy updates for CSE enforcement; Accenture's maintenance of version control or change management records for CSE enforcement SOPs; Accenture Reviewers' ability to escalate CSE enforcement matters to Meta policy teams; restrictions on direct communication between Accenture Reviewers and Meta about content issues outside designated

escalation pathways; and Meta's sign-off or approval on CSE enforcement SOPs used by Accenture Reviewers.

8. **Reviewer Training Programs and Workforce Safeguards.** Training materials provided by Meta to Accenture, and developed by Accenture, for Accenture Reviewers processing CSE enforcement matters, including instruction on criteria for distinguishing reportable from non-reportable content; Accenture's maintenance of Training Completion Records by reviewer, module version, and completion date; performance scoring of Accenture Reviewers based on accuracy against Meta policies; Error Rate Thresholds triggering retraining, discipline, or termination; the WeCare or similar wellness program implemented by Accenture in or about 2018; Meta's requirements regarding Accenture's resiliency plan for moderators; and training provided to team leaders or wellness coaches regarding the WeCare or similar program.

9. **Accenture's Public Positions on Algorithmic Bias and Fairness.** Accenture's February 2018 public announcement regarding artificial intelligence testing services and the "Teach and Test" methodology, including the statement that the Teach phase addresses avoiding gender, ethnic, and other biases; Accenture's June 2018 public statements regarding a tool to detect and eliminate gender, racial, and ethnic bias in AI systems; Accenture's public acknowledgments concerning differential treatment of groups by AI models, the correlation of sensitive variables with other data, and the requirements of debiasing; Accenture's September 2018 publications and statements regarding

ethical AI, AI oversight, and the necessity of governance and training; Accenture's Responsible AI lead's participation in a "fairness" tool challenge with the Alan Turing Institute in or about 2018; and Accenture's public acknowledgments in 2018 that automated models can produce different outcomes for different groups and that fairness requires measuring outcomes for different groups.

10. **QA/Sampling Systems, Enforcement Metrics, and Ratification.** Accenture's QA Sampling protocols for Meta CSE enforcement queues; Accenture's tracking of Final Reviews performed by Accenture Personnel, affirmation versus reversal/restoration rates, error rates, escalation rates, and the percentage of Final Reviews in which Identity-Revealing Imagery was displayed; Accenture's reporting of enforcement metrics to Meta through governance scorecards or similar reporting; the use of QA results to trigger retraining, discipline, or termination; and Accenture's capability to generate reports showing comparative affirmation rates for CSE enforcement matters based on whether Identity-Revealing Imagery was visible to the reviewer.

11. **Comparator Treatment and Restoration Patterns.** Accenture Personnel's processing of CSE-labeled enforcement matters that were subsequently reversed or restored during Q3 2022; Accenture's tracking of Restoration rates for CSE-labeled enforcement matters reviewed by Accenture Personnel; the existence, in Q3 2022 and in the period January 1, 2020 through December 31, 2024, of CSE-labeled accounts restored following Final Review by Accenture Personnel and the visibility of Identity-Revealing Imagery in those

reviews; whether Accenture's QA metrics distinguish Restoration rates based on whether Identity-Revealing Imagery was visible; whether Accenture maintains records sufficient to determine the race of users whose accounts were disabled and subsequently restored under CSE enforcement; differential outcomes during Q3 2022 in which Accenture Reviewers affirmed CSE-labeled permanent disablements for some users while reversing or recommending restoration for others; and the documentation of restoration criteria in SOPs or training materials provided to Accenture Reviewers.

12.    **Disparity Monitoring and Protected-Class Measurement.** Accenture's tracking, or absence of tracking, of user race or ethnicity, and of race or ethnicity proxies, in QA metrics for CSE enforcement; Accenture's performance, or absence of performance, of internal Disparity Analysis Outputs for CSE enforcement outcomes; Accenture's receipt of materials from Meta regarding disparate impact concerns in content moderation; and the existence or absence of any Accenture system to measure or monitor whether CSE enforcement outcomes differed based on user race or based on whether Identity-Revealing Imagery was visible to the reviewer.

13.    **Implementation of 2018 Commitments.** The relationship between Accenture's 2018 public statements regarding fairness, ethnic bias, and differential outcomes and Accenture's actual implementation of those principles in its Meta CSE enforcement workforce, including whether Accenture applied the

"Teach and Test" methodology or fairness tool principles described in its 2018 public statements to its Meta CSE enforcement operations.

14. **Civil Rights Audit Communications and Governance Knowledge.** Accenture's receipt of communications from Meta regarding Meta's Civil Rights Audit conducted between 2018 and 2020, including findings or concerns related to content moderation, algorithmic bias, and disproportionate impact on protected classes; Accenture's discussions with Meta regarding remediation, training changes, or protocol changes in response to the Civil Rights Audit; Accenture's discussions with Meta regarding masking experiments or identity-neutral review protocols; the existence of Governance Meeting Minutes documenting such discussions; and Accenture's pre-Account-Level Enforcement Event awareness of disparate impact concerns based on the Civil Rights Audit or related communications.

15. **Retention, Rotation, Litigation Holds, and ESI Preservation.** Accenture's Retention Schedules in July 2022 for Review Session Telemetry, Tool Access Logs, and Queue Assignment Records, including specified retention periods; the routine Rotation or Overwrite of Ephemeral Log Categories under Accenture's retention policies; the issuance and scope of any Litigation Hold in connection with this litigation, including whether the Litigation Hold covered Ephemeral Log Categories and whether it was issued before or after deletion or overwrite of Review Session Telemetry or Tool Access Logs for July 2022; Accenture's Preservation Steps, or absence of Preservation Steps, for

Review Session Telemetry and Tool Access Logs for July 2022 before routine Rotation or Overwrite; the current availability or unavailability in Accenture's systems of Review Session Telemetry, Tool Access Logs, and Queue Assignment Records for July 2022; and the allocation of retention-policy control between Accenture, for logs maintained on Accenture systems, and Meta, for logs maintained on Meta-provided tools.

16. **Current Practices and Remedy Feasibility.** Accenture's provision, as of the date of response, of Content Moderation Services and CSE enforcement services to Meta; the current default state of Masking in the Reviewer Interface for Accenture Reviewers processing CSE enforcement; the existence or piloting of a Two-Key Exception System and of Separation of Functions; Accenture's capability to generate Quarterly Metrics including the percentage of Final Reviews in which Identity-Revealing Imagery was displayed and comparative affirmation rates for CSE enforcement matters; Accenture's capability to generate and publish a transparency statement describing its role in Final Review of CSE enforcement matters; changes since July 4, 2022 in Accenture's CSE enforcement protocols and training materials; and whether such changes were implemented in response to Meta's Civil Rights Audit, this litigation, or Plaintiff's enforcement event.

17. **Vendor Accountability and User Contacts.** Accenture's receipt and tracking of communications from Meta users seeking review or explanation of permanent account exclusions and other enforcement actions; Accenture's

policies or practices regarding referral of user contacts back to Meta without independent review; Accenture's written procedures regarding user contacts seeking review of enforcement actions; and Accenture's maintenance of logs of user contacts regarding enforcement actions.

## CONFERRAL UNDER RULE 30(b)(6)

Pursuant to the December 1, 2020 amendment to Rule 30(b)(6), the noticing party and the named organization must confer in good faith, before or promptly after the notice is served, about the number and description of the matters for examination. Plaintiff hereby invites Accenture LLP, through counsel, to confer with Plaintiff regarding the matters for examination set forth above. Plaintiff specifically requests that Accenture LLP, on or before April 22, 2026, identify in writing (a) each individual Accenture LLP intends to designate as a Rule 30(b)(6) witness, and (b) the matters for examination on which each designee will testify, so that the deposition may proceed in an orderly fashion on April 29–30, 2026. Plaintiff is available to confer by written exchange consistent with the Designated Communication Protocol.

## SCHEDULING AND ACCOMMODATION

Consistent with the Middle District Discovery Handbook, Chapter II.A, Plaintiff states his willingness to confer in good faith regarding any reasonable rescheduling necessary to accommodate the schedules of counsel and the

designated witnesses. Plaintiff requests that any request for rescheduling be communicated in writing on or before April 22, 2026. Absent a written, mutually agreed alternative date, the deposition will proceed as noticed on April 29–30, 2026 in Kissimmee, Florida.

## APPEARANCE OF PLAINTIFF AND DOCUMENTATION OF NON-APPEARANCE

Plaintiff will appear at the noticed location at the noticed date and time, with the court reporter and videographer previously retained by Plaintiff for proceedings in the related actions, prepared to proceed with the examination. In the event that no designee of Accenture LLP appears, Plaintiff will, on the record, identify the case, the notice, the date, the time, and the location; will call the deponent on the record at intervals; will direct the court reporter to prepare and certify a Certificate of Non-Appearance; and will direct the videographer to preserve the audiovisual record of the proceeding. The Certificate of Non-Appearance, the court reporter's invoice, the videographer's invoice, and any associated facility and travel costs will be retained by Plaintiff for use in subsequent proceedings under Federal Rule of Civil Procedure 37(d).

## DISCOVERY POSTURE

The Rule 26(f) conference between Plaintiff and Defendant Accenture LLP in this action concluded on April 6, 2026, upon transmittal of Accenture's written

position on each topic required by Rule 26(f)(2) in the form of a draft Uniform Case Management Report. The discovery moratorium imposed by Rule 26(d)(1) has lifted as to Defendant Accenture LLP. The Middle District of Florida does not automatically stay discovery pending resolution of motions filed under Federal Rule of Civil Procedure 12. The filing of a motion to stay discovery does not stay discovery; only an order entered by the Court has that effect. No order staying discovery has been entered in this action.

## SERVICE

This notice is served on counsel of record for Defendant Accenture LLP by electronic mail under Federal Rule of Civil Procedure 5(b) and consistent with Plaintiff's Designated Communication Protocol on file in this action.

Dated: April 7, 2026                                    Respectfully submitted,

Marvelle J. Ballentine
Plaintiff, pro se
7862 W. Irlo Bronson Memorial Hwy #82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2026, a true and correct copy of the foregoing Plaintiff's Notice of Deposition of Defendant Accenture LLP Pursuant to Federal Rule of Civil Procedure 30(b)(6) was served by electronic mail upon counsel of record for Defendant Accenture LLP, Marianna C. Chapleau, Esq. and Devin S. Anderson, Esq., Kirkland & Ellis LLP, consistent with Plaintiff's Designated Communication Protocol on file in this action.

Marvelle J. Ballentine